## MARIE FERNANDEZ SOARES v. ERNEST JOSEPH FREITAS AND AGNES SOARES FREITAS, HUSBAND AND WIFE.

### No. 2656.

SUBMITTED FEBRUARY 10, 1948.    DECIDED MARCH 15, 1948.

KEMP, C. J., PETERS AND LE BARON, JJ.

OPINION OF THE COURT BY LE BARON, J.
(Peters, J., dissenting.)

This is a suit in equity, brought by the petitioner against the respondents, to cancel a written agreement for the sale of real estate between the petitioner as seller and the respondents as purchasers. It is predicated upon the ground of actual and constructive fraud on the part of the respondents, the petitioner alleging in her petition that she relied upon misrepresentations of the respondents as to the contents of the agreement and was induced to execute it under the influence of the respondents who took advantage of their relationship and proximity to her with knowledge of her advanced age, ill health, minimum education and inexperience in matters of this kind. Issue was joined and hearing held. The circuit judge found (1) that a confidential relationship existed between the parties; (2) that the petitioner was of such weakened mind and insufficient education and training that she did not sufficiently understand the legal effect of the agreement or perceive that she was not obtaining from the agreement that which she intended, even though the provisions were explained to her; (3) that the execution of the agreement constituted a fraud upon her. A decree of cancellation was entered accordingly. The respondents appeal.

The appeal challenges the circuit judge's findings and presents the question whether the evidence adduced is sufficient as a matter of law to establish fraud warranting invocation of the equitable remedy of cancellation.

It is generally held that the power to cancel a written agreement or contract is the most extraordinary power possessed by a court of equity which may not be exercised except in a clear case and upon strong and convincing

evidence. (For collection of authorities see 12 C. J. S. 1060, § 71, n. 78.) This is particularly true where the ground is fraud, proof thereof being required by a preponderance of evidence great enough to repel opposing presumptions of validity of the instrument and fair dealing between the parties. The proof should be of such weight and cogency as to satisfactorily establish the wrongful conduct charged, honesty and fair dealing, as a rule, being presumed. (*Sanders* v. *Rhea*, 119 Okla. 208, 249 P. 350; *Cloud* v. *Young*, 103 Okla. 65, 229 P. 604.)

As stated in the case of *Christian* v. *Waialua Agricultural Company, Limited*, 31 Haw. 817, at page 821, "It has long been the rule of this court that 'in equity cases, on appeal, while the findings of the circuit judge are given weight and under certain circumstances, especially on pure issues of fact, would be allowed to control, the supreme court nevertheless is authorized and has always exercised its right and duty to weigh the evidence and to make its own findings.' *Godfrey* v. *Kidwell*, 15 Haw. 526, (1904)."

The issue of fraud is one of mixed law and fact. The circuit judge made no findings with respect to actual fraud nor does this court find that the petitioner sustained her burden thereon. There being an absence of proof of misrepresentations, concealment, false pretenses or other manifestations of actual fraud on the part of the respondents, the field of inquiry as to the sufficiency of evidence is narrowed to constructive fraud.

The constructive fraud upon which the decree of cancellation is predicated is not one apparent from the intrinsic nature and subject of the transaction, but arises, if at all, from the condition and relations of the immediate parties to the transaction. The issue thereon as framed by the pleadings is that of undue influence, upon which the circuit judge made no findings relative to the respondents' culpability. Hence it is doubly the duty of this court to

make its own thereon. Under that issue the petitioner's dependent or fiduciary relation to the respondents, her mental and physical weakness, minimum education, lack of independent advice and other conditions and circumstances rendering her peculiarly susceptible and yielding to undue influence are but incidents of it. Undue influence must operate at the time of execution and consists of mental, moral or physical coercion, destructive of free agency, or pressure of whatever character carried to such degree that the party's free play of judgment, discretion or wishes is overborne. But within this limit there is no objection to argument, persuasion or even influence brought to bear upon a party, provided his mind is able to act and is left free to decide upon the considerations addressed to it, so that the agreement is really his own voluntary act. (See 3 Pomeroy's Eq. Jur. Fifth Ed. 776, § 951, n. 19 and 20, for collection of authorities. The issue thus pertains to a wrongful subversion or control of the petitioner's mind by the respondents, not mere preeminence induced by kindness and filial devotion. The issue presupposes not only the petitioner's ability to understand, but her requisite legal capacity to enter into a binding contract had she been free from undue influence. (See *de Souza* v. *Soares,* 21 Haw. 330; *Sumner* v. *Jones,* 22 Haw. 391.) Consonant thereto, the evidence does not establish that the petitioner was mentally incompetent or that her mental deterioration was of a degree as to be the equivalent of a lack of capacity, the presumption being that she possessed sufficient reason and intelligence to know the nature of a binding contract and be capable of carrying it out. Involving as it does the overpowering of such faculties of the mind, the issue of undue influence requires scrutiny of the evidence with respect to its sufficiency to prove the wrongful conduct charged in the petition. In doing so the undisputed evidence and state of

the record, together with the reasonable inferences to be drawn therefrom, will be considered.

The petitioner is the mother of one of the respondents and mother-in-law of the other. She lived with them in the same cottage and still does, regarding them with warmer affection than she did any of her other children. Harmonious relations prevailed between the parties until several months after the date of execution. At the time of execution the petitioner was approximately sixty years old. Her schooling was meagre and she could read and understand only simple English. Prior thereto and up to the date of execution, she actively carried on the ordinary business of collecting rents, paying taxes, assessments and utility and maintenance charges upon the property. Four years previous she sold property owned by her and on her own initiative purchased that now under agreement of sale, checked assessments against it without assistance and contracted for the erection upon it of two cottages. In conducting such affairs no evidence was adduced that she reposed particular confidence in either of the respondents or relied upon their advice. Her business experience was more extensive than that of the respondents, who had little or no experience in dealing with real estate, the disparity between the parties of such experience tending to offset the superiority which the respondents had in schooling and degree of mentality. Concededly the petitioner had deteriorated physically and mentally due to a progressive hardening of the arteries and heart trouble, causing bodily fatigue and emotional disturbances of nervousness, agitation and apprehension which were of irregular occurrence and sometimes real but more often dissimulated. No evidence was adduced, however, that such deterioration was incompatible with a reasonable comprehension of business transactions, nor that the petitioner was visibly disturbed emotionally when either dis-

cussing or executing the agreement, she being moved primarily by a desire to be rid of the responsibilities of ownership because of her physical infirmities.

The agreement constitutes the culminating point of several weeks of interfamily discussion. Its language is simple. It is clear and unambiguous, drawn from notes of the intention of the parties as taken by an adviser of the petitioner's own choosing. This adviser was head of a business college, who, although not a practicing attorney in the territorial courts of record, was licensed to and did formerly practice in the district court of Honolulu and the United States Court for the District of Hawaii. No proof was adduced that he misadvised her or incorrectly recorded the notes of intention nor that the attorney of record misread them in preparing the agreement in conformity therewith. Furthermore, the adviser explained the agreement to the parties, provision by provision. The petitioner not only appeared attentive thereto, but read the agreement herself before executing it, intelligently calling attention to the harshness upon the respondents of the provision requiring prompt payments. She also intelligently replied to a question of the adviser that no interest was to be exacted.

It is not contended that the respondents were in possession of facts unknown to petitioner, or that a mistake of fact was made. Neither do the pleadings present any question of mistake of law, nor the evidence that of misapprehension of the law by the petitioner of which either the respondents or the adviser was aware at the time of execution and which they did not rectify. It is true that the petitioner, although having the opportunity, did not seek or obtain independent legal advice, but neither did the respondents, the parties availing themselves in each other's presence of the same adviser, who testified that their meeting in his office was at the instance of the peti-

tioner. Nor do the results indicate that the petitioner suffered therefrom, but rather, if anything, the undisputed evidence demonstrates that she was treated more favorably than the others. The respondents came to the office of the adviser with no intention other than to seek at a proffered purchase price an absolute conveyance in fee simple. But the adviser proposed that there be reserved to the petitioner out of the property to be conveyed the use and occupancy of the cottage on the front, and presumably more valuable portion, for her life, with the burden accordingly upon the respondents to pay utility and upkeep charges thereon and the taxes, assessments and all other charges that may legally be imposed upon the entire property. By mutual assent this reservation became a part of the agreement without diminution of purchase price. These circumstances rebut any inference of the operation of undue influence at the time of execution and tend to establish that the petitioner acted on her own free will and promptly took advantage of the situation. Furthermore, there is nothing to be found in the relationship of the parties that obviated her duty of inquiry had she entertained the slightest uncertainty as to any term or provision. Not having either exercised that duty or questioned the legal effect of the reservation, the petitioner under the circumstances can not be heard to complain later in equity that she did not do so and that her intention would have been different had she been more competently advised or secured independent legal advice. (See *Cummins* v. *Carter*, 17 Haw. 71.) The most that can be said of the petitioner's uncorroborated testimony is that she subsequently discovered, after harmonious relations with the respondents had been disrupted, that she had not understood at the time of execution what was the limitation of her rights under an unambiguous reservation made for her benefit and mutually agreed upon. Such subjective testimony is

not cogent of the wrongdoing charged nor was inequitable conduct on the part of the respondents proved. (See *Adkins* v. *Hoskins,* 176 Ark. 565, 3 S. W. [2d] 322.) Mere failure to appreciate the legal effect of a provision openly discussed and mutually determined does not suffice as a ground of cancellation even if it had been averred. (See *Holczstein* v. *Bessemer Trust & Savings Bank,* 223 Ala. 271, 136 So. 409; *In re Estate of McIlrath,* 276 Ill. App. 408; *Crane* v. *Smith,* 243 Mich. 447, 220 N. W. 750; *Robinson* v. *Fairmont Trust Co.,* 109 W. Va. 152, 153 S. E. 909.) Nor was it established that the respondents obtained an advantage at the expense of the petitioner, no evidence being adduced of the value of the property, subject as it was to the petitioner's life interest and right of enjoyment. Consistent with the presumption of honesty and fair dealing, the agreement must therefore be deemed to be equitable and mutually beneficial, no question of inadequacy arising.

In weighing all the evidence, the opinion of this court is that the petitioner's case is not a clear one warranting the equitable remedy of cancellation. This opinion is premised upon a finding that there is no strong and convincing evidence of either actual or constructive fraud to be found in the entire record and particularly none of undue influence by the respondents or of their fraudulent advantage of any of the petitioner's infirmities; that neither the condition and relations of the parties, nor the surrounding facts and circumstances of execution, established by the undisputed evidence, tend to repel, but rather are consonant to, the presumptions of validity and fair dealing, demonstrating as the evidence does that the petitioner acted intelligently, understandingly and voluntarily.

No useful purpose would be served by a recital of all the evidence, but it is proper to supply some of the minutiae of the pertinent facts and circumstances, which are: that

the petitioner told the respondents she had been offered seventeen thousand dollars for the entire lot and improvements, but would give them the first chance to buy; that she was under no financial distress; that the respondents at that time were interested in buying only the rear portion of the lot, the cottage thereon being the one in which they were and now are living with the petitioner; that the respondents offered five thousand dollars for it, and subdivision was attempted so that the parties could enter a contract for the sale of the rear portion at that price; that this plan was thwarted by a legal prohibition against subdivision; that the petitioner sought counsel of the adviser, who explained and verified the prohibition to her; that discussions for the sale of the rear portion then terminated and those for the sale of the entire lot and its improvements commenced, the respondents offering six thousand dollars; that the petitioner did not reject this offer but when the legal adviser proposed, and the respondents agreed to, the reservation with respect to her life interest and right of enjoyment, she accepted the offer as modified; that the petitioner was apparently satisfied with the resultant written agreement until several months after execution when friction of a domestic nature arose between her and the respondents, aggravated by gossip and rumors relayed to her by third parties in disparagement of the agreement and its limitations, and her attitude changed adversely towards the respondents; that the petitioner thereafter for the first time stated that she had intended to retain the right to mortgage the front portion and the right to dispose of it upon death; that although the legal effect thereof would be diametrically opposed to that of the reserved use and occupancy of the cottage for her life, as well as being incompatible with the sale of the undivided lot, especially of one not legally susceptible to division, and even though the petitioner had not previously dis-

closed such an intention with respect to the sale of the entire lot to either the respondents or adviser, she verbally accused the respondents of being "crooks" and demanded that the agreement be reformed; that the petitioner, concededly being "easily agitated" and "a very apprehensive sort of person," brought suit to cancel the agreement upon the ground of fraud. Such background of the petitioner's case demonstrates that it would be an injustice upon the respondents to abrogate the agreement and serves to emphasize the absence of grounds for equitable relief. The question presented is therefore answered in the negative.

Decree reversed and the cause remanded below with instructions to dismiss the petition.

*W. C. Tsukiyama* for appellants.

*King & McGregor* for appellee.

#### DISSENTING OPINION OF PETERS, J.

Cases in equity determined by the circuit judges at chambers are removable to the supreme court either by appeal or writ of error. The supreme court in reviewing decrees in equity upon appeal is not confined as in cases upon writ of error to errors in law. But the practice of the court, pursuant to its statutory powers,[1] is to examine into the merits of the cause upon the evidence in the record, affirm or reverse the decree in part or in whole and either remit the record for further proceedings or render a final decree and enforce it in the ordinary mode. This was the practice in the House of Lords in England;[2] was the method adopted by the Congress in the Judiciary Act of 1803[3] and "was taken over into appeal in the nature of error in equity cases under practice acts and codes of civil

---

[1] R. L. H. 1945, § 9505.

[2] 3 Bl. Comm. p. 454; 2 Daniell's Chancery, P. & P. 6th Am. Ed., star paging 1499, 1504, 1505; Jones Ed. vol. III, § 598.

[3] Act of Mar. 3, 1803, 2 Stat. c. XL, p. 244; The San Pedro, 2 Wheat. 132, 137; Conn v. Penn, 5 Wheat. 424.

procedure" in many of the states.[4]  Some courts gave to a finding of fact by a judge or chancellor the force of a verdict while others, and they constitute the majority, held "that the reviewing court was not bound by the findings of fact below and must determine for itself whether they were sustained by the evidence, allowing much, however, for the advantage the trial judge had where he heard oral evidence."[5] Under the early equity practice, however, cases were heard mostly upon deposition,[6] and the trial judge being in no better position than the reviewing tribunal to judge of the credibility of witnesses whose evidence had been taken upon deposition, the former had no advantage over the latter.  With the radical change, however, from "hearing equity cases on depositions to trial to the court on oral evidence," the findings of the chancellor upon conflicting oral evidence necessarily had its effect upon the approach of the reviewing tribunal.  Appellate courts grouped for an appropriate formula.  Professor Pound points out the resulting confusion.[7]  This court adopted the rule that the findings of the circuit judge at chambers upon conflicting oral evidence is entitled to "great weight." It would seem that this formula should be of easy application and that if the findings of the trial judge in equity cases upon conflicting oral evidence have for their support a fair preponderance, such findings should not be disturbed. Otherwise, no allowance is made "for the advantage the trial judge had where he heard [the] oral evidence."[8]

The cases in this court applying the formula adopted sustain the construction placed by me upon the rule.[9]  In

[4] Pound, App. Proc. in Civ. Cas., p. 300, cases cited at note 2.

[5] *Id.* p. 300, note 5.

[6] Linn v. Barkey, 7 Ind. 69.

[7] Pound, App. Proc. in Civ. Cas., p. 301.

[8] *Id.* p. 300, note 5.

[9] De Souza v. Soares, 22 Haw. 17, 18; Sumner v. Jones, 22 Haw. 391, 394; McCandless v. Castle, 25 Haw. 22, 33; Nawahie v. Goo Wan

the *de Souza* case the findings were based in part "on undisputed evidence and in part on evidence the truth of which, though disputed, we find no reason to doubt." The plaintiff's claim in that case was that she executed the deed, cancellation of which was sought, while mentally incompetent at the defendant's pressing solicitation and in consequence of undue influence exercised upon her by the defendant and his wife. The defendant denied the truth of these charges and claimed that the plaintiff executed the deed of her own free will and for reasons personal to herself. This court said: "The circuit judge, although basing his decree in part upon another ground, found 'not only that the plaintiff had failed to establish fraud by a preponderance of the evidence but that the defendant's testimony of the absence of misrepresentation, though not absolutely convincing, carries with it more weight than the testimony of the plaintiff.' Such a finding made by one who saw and heard the witnesses and was in a position more favorable than ours to weigh the evidence, is entitled to great weight." The implication of this decision is that had the trial judge found that the plaintiff had established fraud by a preponderance of the evidence the findings would not have been disturbed.

In the *Sumner* case, also one for cancellation of a deed upon the lack of mental capacity and fraud, this court said: "Whether the evidence would have warranted a finding that the plaintiff lacked mental capacity sufficient to make a valid deed we need not say. On an appeal in an equity case the findings of fact made by a circuit judge are not binding on this court, but there is a presumption that the case was correctly decided, and where the findings rest upon the credibility of witnesses and the weight of oral

Hoy, 26 Haw. 137; Jellings v. Garcia, 29 Haw. 698; Hookaia v. Kealoha, 30 Haw. 446, 449; Pinheiro v. Pinheiro, 32 Haw. 659, 664; De Mello v. De Mello, 34 Haw. 922, 933.

testimony, and inferences to be drawn from such testimony, and involve the consideration of opinion evidence, the findings of the judge who saw and heard the witnesses are entitled to much weight." The use of the word "much" instead of the word "great" in the formula applied need not be dwelt upon. Whether there is any significance in the use of the word "much" is left for others to decide.

In the *McCandless* case we find this significant language: "On an appeal in an equity case the findings of fact by the circuit judge are not binding on the supreme court, but where the findings depend upon the credibility of witnesses and the weighing of conflicting testimony such findings are entitled to great weight" [citing the *Sumner* case]. "The finding of the circuit judge in this case upon the issue of fraud is upon conflicting testimony and will not be disturbed."

In the *Jellings* case the court held: "It has been repeatedly held by this court that when in an equity suit an issue of fact is decided upon conflicting testimony great weight will be given by this court to the finding of the trial court because the latter saw and heard the witnesses and was in a better position to pass upon their credibility and to weigh the evidence than this court is. Upon an examination of the transcript of the evidence in this case we find no reason for disturbing the finding of the trial judge."

In the *Hookaia* case, after repeating the rule, the court concluded with the observation that "ordinarily" the conclusions of the trial judge upon conflicting evidence "will not be disturbed." In the *Pinheiro* case the acceptance of findings supported by a preponderance of the evidence and in the *De Mello* case the application of the rule, which I contend is the logical sequence to the formula adopted, is expressed in the following language: "It was peculiarly the province of the chancellor, who heard and saw the

witnesses testify in open court and who heard the evidence of the petitioner, which was perpetuated before the same chancellor prior to the trial, to determine the truth of the controversy. A chancellor's finding of fact from conflicting testimony heard by him will not be disturbed on review *unless clearly against the preponderance of the evidence."* (Italics supplied.)

Upon the submission of the case the trial judge rendered the following oral opinion:

"There has been much offered in evidence that the Court does not believe has very much bearing on the ultimate issue in this case, and as far as the Court is concerned it can be reduced very simply. There is no question as to the execution of the agreement; the general circumstances attending its execution, and that is the agreement that is now being sought to be set aside.

"The first issue is as to whether or not that agreement included the provisions that Mrs. Soares intended to have included, and in order to make a ruling on that point it is necessary to go back to sometime before the agreement was actually drafted and executed, to see the background of the general plan of the intended transfer of title to the daughter by the mother. There is no question that in this picture here there was ample grounds for the mother to favor the daughter, who now appears as a respondent in this case, not only from the standpoint of possible mistreatment and indifference by other members of the family to her, but because of the close association of the daughter with her, but it stands out clearly in the Court's mind that even though there was an over-all intention of providing for the respondent daughter who had just married, and to favor them with a home, that it still was the intent of the petitioner to retain for the remainder of her life some security in that premises; almost all the witnesses testified directly to that; Mr. Whitlow and the other daughter, Cecelia Faria, and the respondents, in effect, that it was her intention to sell the back half to her daughter and son-in-law and to retain the front cottage and the front half of the lot. Then they ran into difficulties, and the evidence all dovetails in,—the City and County ordinances being an obstacle to making a direct division, and the subdividing of the lots, and this was explained or attempted to be explained to Mrs. Soares by Mr. Whitlow, and I recall his testimony to the effect that she did not comprehend it. So from there we come down to the date of the execution of the agreement of sale on December 20, 1944, which was in the office of Mr. Whitlow, after

preliminary conferences with him, and it hardly seems material as to who is faulty in their memory on whether there were any prior individual conferences or not, although my memory is that Mrs. Soares stated that she had contacted Mr. Whitlow on the suggestion of her daughter, but on that occasion there is also much ground to believe that the mother, not comprehending fully the significance of the inability to subdivide the property as originally was intended, still had in mind that the disposition of the property be made on a basis that would retain in her an interest in the view of the law of a more tenuous nature than that of mere occupancy, which was the reservation in the agreement of sale. Counsel in argument referred to it. Counsel for the respondent referred to it as her desire to retain a fee simple,—the words are not exactly to that effect, but the meaning is obvious that she intended it for two purposes, not only for her own protection, during her lifetime, to have some security that she could call on for hospital or other expenses, but also for the purpose of permitting her to make a disposition of that property after death. The Court would find that her purpose and intent in that respect was not fully covered in the agreement.

"It is true that she conferred with and resorted to Mr. Whitlow, but I hardly believe that it could be contended here that he was acting or attempting to act in the capacity of an attorney or counsel to advise her in a matter which would require considerable legal study to accomplish, upon the desires of the grantor, and furthermore there is nothing in the evidence here to indicate that he was representing her any more than he was the respondents. The inference is that the original acquaintance was between Mrs. Freitas and Mr. Whitlow, and that Mr. Whitlow was originally known by Mrs. Freitas through her connection with his business school.

"On the other basis offered in the petition for annuling the agreement the Court feels a different result is in order. There is a difference in the testimony of the petitioner and the respondents as to whether or not any provision was to be made for the peitioner's support and maintenance as a consideration or inducement for the execution of this agreement. But even on the petitioner's testimony. I don't believe that the evidence would warrant setting this agreement aside on the grounds that there had been a failure in that respect. There is no question that it probably was understood as Cecelia Faria testified, that her sister Agnes would maintain the mother in her household, but the only testimony before the Court is that of the petitioner; that is the only direct testimony, to the effect that her daughter Agnes Freitas and her husband had promised that they would take care of her during the remainder

of her lifetime. There is no testimony to the effect that that provision should have been included in the agreement of sale. So that in that respect there has been no denial on the part of the respondents, the evidence clearly showing that for a considerable time after the execution of the agreement of sale that they, either pursuant to such an agreement or voluntarily, did undertake to maintain her,—that is, the petitioner, in their household, and that if there was any discontinuance of that practice it was only the natural result of the unhappy situation that followed from the disruption of the family relationship over this property.

"As the Court has stated, it finds that there was that provision intended by the grantor to be included in the deed that was not included, and the next question is: Was that responsibility hers or otherwise? And in that connection the Court will have to make another finding.

"MR. TSUKIYAMA: May I interrupt the Court? Has the Court examined the agreement of sale itself with particular reference to the reservation?

"THE COURT: The reservation of occupancy. As I say, that was not what she intended. The reservation of occupancy would mean, as it is framed, slightly more than her right to use the house, and my finding is that at the time this agreement was entered into, both on the testimony of the petitioner, as supported by the surrounding facts and circumstances, including the generally agreed original intention to divide this property in half,—that she expected to have reserved to her a right in the first half, which would in effect amount to her control over that portion of the premises as if it were hers in fee. In other words, in accordance with her direct testimony, not only the right to use that property to cover hospital expenses and the like, which might occur in her lifetime, but the right of disposal of it when she passed away.

"And as a finding in that connection, that is as to whether or not the petitioner can be held responsible under the circumstances for not being covered in the agreement of sale, the Court will have to disagree with the contention of counsel for the respondents that the petitioner was not mentally as well as physically ill. Dr. Gaspar, I think, directly testified to that, when he states that in effect that due to the physical condition, the high blood pressure and the arteriosclerosis, that she had a degeneration of the mind and of the brain; that her mind was not what it used to be. But aside from Dr. Gaspar's testimony the Court hardly needs the assistance of a medical expert to conclude the same; not only from the observation of the petitioner, but from what might be gathered from the testimony relative to her actions at times. The unfortunate incident following slightly after the disagreement, that of declining

her daughter Cecelia Faria's request to be permitted to use the front cottage, giving distress to her family, then out in the street, and wherein she testified that the mother hollered out to the neighbors, making accusations that were wholly unfounded, and similar incidents reported by the brother-in-law, and testimony relative to the mother's conversing with the neighbors and making false accusations, and the like, over the 'phone, all clearly indicate an unstable mind, a mind that clearly is easily upset, so this Court cannot find that Mrs. Soares possessed a firm mind, the firm mind that the respondents contend she did, and by that the Court does not mean that she did not have the capacity to execute a will, or is not competent to enter into any other legal contract; it is not necessary to go that far, and the Court does not contend or hold that she was incompetent; if it thought she were, there would be no ground for setting aside this agreement. That factor, plus the fact that we are dealing here not with a case involving a person to a contract standing on equal footing, but only with inequity clearly recognized to create a confidential relationship, wherein the transactions involved are scrutinized and adjudged on an entirely different basis than transactions entered into by people standing on an equal footing. There is no necessity of referring at length to the authorities of this jurisdiction. There are many of them that point clearly to the principle involved. Maybe reference to Keanu v. Kamanoula, 20 Hawaii 96, should be sufficient, that case being one in which the daughter was dealing with the parents and the language there, quoted by the Court, and some of the authorities, is pretty strong in indicating the approach to a decision of this case. In fact, it is stronger than necessary, in the Court's mind, for the decision in this case, and I quote at page 100, an extract from Bigelow on Fraud:

" 'When a party, complaining of a particular transaction, such as a gift, sale or contract, has shown to the court the existence of a fiduciary or a confidential relation between himself and the defendant, and that the defendant occupied the position of trust or confidence therein, the law raises a suspicion, or, it is often said, a presumption of fraud.'

And again, on page 101, from Pomeroy:

" 'Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such

confidential relation had existed.'

"So that, in accordance with the views heretofore expressed, this Court will have to hold that there existed a confidential relationship between the parties hereto, and that they did not stand on an equal footing, and the respondents both are intelligent people, of stable minds; the petitioner is quite the contrary, not only is she, the Court holds, of a weakened mind due to her physical condition, but she lacks also sufficient education or training to have sufficiently understood these transactions involved in this agreement of sale to have permitted her to perceive whether or not, as it was explained to her, she was obtaining what she intended to obtain by way of a reservation, and that, consequently, the execution of this agreement of sale constituted a fraud upon her, and the prayer to have it cancelled will be granted upon the return,—or the making available to the respondents the $3,650. paid in under the agreement and now on deposit with the Clerk of this Court."

The plaintiff took the stand on her own behalf. Twice during the course of her evidence she broke down and the court was required to recess. The trial judge was in a position to judge whether her distress was real or dissimulated. Her evidence is disconnected and far from satisfactory. Obviously, the personal observations of the circuit judge of the appearance, manner and conduct of this witness has not been perpetuated and is not contained in the record. She was the subject of the issue of mental capacity. The judge gave expression to his reactions and he took her appearance, manner and conduct as a witness into consideration in concluding that at and prior to the time of the execution of the agreement of sale she was weak-minded and incapable of appreciating the legal effect of what she was doing. Her mental capacity and her ability to appreciate that the document in question to the extent that it affected the front half of the premises were the two determining issues in the case. The evidence upon these issues was conflicting, especially in respect to her ability mentally to appreciate the extent to which the agreement of sale affected her rights in the property. This conflict was settled and resolved by the circuit judge in

favor of the plaintiff. His decision has the support of a clear preponderance of the evidence and, to repeat and apply the language of this court in the *De Mello* case, his findings should "not be disturbed on review unless clearly against the preponderance of the evidence."

I do not want to enter into any controversy with my brothers of the majority upon the question of whether the evidence sustains their findings of fact, or whether the principles of law enunciated by them are applicable. I am content to abide by and not disturb the conclusions of the learned trial judge. They have my unqualified approval. To enlarge upon or discuss the testimony which in my opinion sustains the burden of proof, or to attempt to demonstrate by references to the testimony that the evidence upon the issues presented clearly preponderates in favor of the plaintiff would serve no useful purpose. The primary object of this opinion is to protest against the disregard by this court of the findings of the trial judge in an equity case upon conflicting oral evidence where those findings are amply supported by a preponderance of the evidence and its failure to apply thereto a rule of its own adoption. If, as I view the opinion of the majority, a finding of a chancellor upon conflicting oral evidence may be re-examined by this court with absolute disregard of the credibility of witnesses and the weight of evidence determined by the trier of the facts, favorable findings *nisi* in equity cases upon conflicting oral evidence have become valueless.