KAM CHIN CHUN MING, KAM HON HO, KAM YEE TING, KAM MAN HO, KAM KONG HO, AND YOUNG TIM HO *v.* KAM HEE HO, EXECUTOR UNDER THE WILL AND OF THE ESTATE OF HO POI, DECEASED, KAM MOON KAM, KAM YIN ENG, KAM MEE CHAR, KWAN HEEN HO, KAM HOU WONG, KAM LO HO, KAM YIP CHOCK, KAM SUNG DOTT, HOON CHEONG MOCK, AND KOON CHUNG BERTELMANN.

No. 4094.

MAY 2, 1962.

TSUKIYAMA, C. J., CASSIDY, WIRTZ, LEWIS, JJ., AND CIRCUIT JUDGE KING IN PLACE OF MIZUHA, J., DISQUALIFIED.

OPINION OF THE COURT BY LEWIS, J.

This is an appeal from a judgment which, after trial, dismissed a petition in an action seeking to set aside a family settlement and the order of the probate court based thereon.

Ho Poi, hereinafter referred to as decedent, in 1890 at the age of 27 went from Hawaii to the village in China from which he had emigrated, returning to Hawaii in 1891 with a wife, Chang Shee. Under the pleadings it is undisputed that Chang Shee was the mother, and Ho Poi the father, of the six petitioners-appellants and the respondent-appellee Kam Hee Ho. In the court below these parties were referred to as "the seven," while the remaining parties were referred to as "the ten." The same designations will be used in this opinion. At times the six petitioners-appellants will be referred to as "the six."

A relative who, at decedent's request, emigrated in 1894 from the above-mentioned village to Hawaii and took up residence here, testified that at that time there was living in decedent's household "a servant girl" thirteen years of age bearing the surname of Chun. It is contended by petitioners that from and after 1899, this girl, named in the petition as Chun Shee and at times referred to in the testimony offered and papers filed by the six as a "step-mother" or "concubine,"[1] bore twelve illegitimate children

---

[1]Concerning the Chinese practice of concubinage see *Ah Leong* v. *Ah Leong*, 29 Haw. 770, 775-76, *rev'd*, 27 F.2d 582.

of decedent, of whom two predeceased him and the others are the respondents-appellees referred to as "the ten." The court below did not rule on this contention, deeming it immaterial by reason of the family settlement, the circumstances of which will appear later in this opinion.

According to the contentions of the petitioners-appellants the youngest of the seven was born in 1909, while the youngest of the ten was born in 1917. It is undisputed that all of them lived with Ho Poi and Chang Shee in the family home on Lusitana Street, Honolulu. Until her death in 1918 Chun Shee also lived there.

Chang Shee died intestate August 11, 1927; no proceedings were taken with respect to her estate until a petition for determination of heirs was filed on June 18, 1952 by the same six who are appellants here.[2] Ho Poi died May 29, 1941; his will, made February 28, 1935, was probated on July 21, 1941 on the petition of respondent-appellee, Kam Hee Ho, one of the seven, named therein as executor and so appointed.

The will was not contested. It left the entire estate to "my lawfully begotten children, surviving me at the time of my death, share and share alike." The petition for probate named the seven as the only heirs at law and next of kin.[3] On August 11, 1941, two of the ten entered their appearance and claimed that the ten "are also the children, heirs at law and next of kin of said Ho Poi, deceased * * * and as the children of said Ho Poi, deceased, are entitled to an equal share of the estate of

[2] Evidence was taken in this proceeding (Equity No. 5664, First Circuit) in January, February and March 1959. According to the record in this court the matter has not been decided.

[3] Cf., R.L.H. 1955, § 330-12, which provides that children whose parents have not been legally married "shall be denominated illegitimate, and shall not be entitled to inherit from their fathers, without express bequest * * *."

said deceased according to the provisions of said deceased's Will * * *."

It was not until September 25, 1945 that the executor filed his petition for approval of final accounts and distribution of the estate, appending accounts for the period to and including the month of August 1945. This petition named the seven as entitled to the distribution of the estate. On reference to a master he reported on April 17, 1946, calling attention to the fact that "the identity of the person or persons entitled to share in the said estate has not been judicially determined." Meanwhile notice had been published that the petition would come on for hearing on November 5, 1945, from and after which date there were successive adjournments to May 17, 1948. On that date the executor gave testimony as to the signature by all seventeen of a paper entitled "Family Settlement," signed on various dates from March 6, 1947 to May 6, 1948. This document thereupon was filed,[4] and the court adjourned the matter for filing of a decree for distribution "approved by both counsel."

The decree, entitled "Order Approving Final Account of Executor and Distributing Estate," was filed July 6, 1948. Reciting the execution of a "Family Settlement" whereby "it is covenanted and agreed that all of the seventeen children above named are the heirs at laws [*sic*] of said deceased and are entitled as such to participate equally in the distribution of the estate," it ordered a one-seventeenth share of the estate distributed to each of the seventeen. Subsequently, as we have said, six of the seven, that is, all but the executor, sought to repudiate this decree and the underlying family settlement.

At this point we note that of the seven only the executor, as such, was represented by counsel in the

---

4It is referred to herein as "the family settlement."

probate court on the aforementioned dates. It was counsel for the executor who prepared the decree, which was approved as to form by counsel for the ten. At that time the other six had not appeared in the probate proceedings, with the exception of Kam Hon Ho, the eldest son, whose appearance was entered by an attorney on July 21, 1941 and not withdrawn of record until November 19, 1956. So far as shown, this attorney was not served with any of the papers in the probate proceeding. We will consider this matter at a later point in this opinion.

The probate record is before us and shows as follows: When the order of July 6, 1948 was filed the executor had not filed his accounts for the period during which continuances had been allowed on the petition of September 25, 1945. The filing of supplementary accounts was ordered on August 2, 1951, at a hearing on motions filed by the ten on April 16, 1951. One of these motions attacked certain leases made by the executor, Kam Hee Ho,[5] and sought to set them aside. The other asked that the executor be surcharged for failure to collect rents for a house belonging to the estate allegedly occupied by one of the six, and for improper expenditure of funds allegedly made in improving property belonging to another of the six.

Kam Hon Ho was one of the lessees involved in the first motion and filed a return when it came on for hearing on August 1, 1951. In this return he took the position that the title to the real property was vested in the devisees under Ho Poi's will, that the ten were not such devisees, and that the probate court was without jurisdiction to include in the order of July 6, 1948 any provision determining the devisees entitled to the real estate for lack of the notice required by section 12014, R.L.H. 1945, now R.L.H. 1955, § 317-14. The family settlement of May

---

[5]According to the evidence at the hearing on these motions, the leases were made both before and after July 6, 1948.

17, 1948 was attacked on the grounds of fraud, duress, mistake, and lack of consideration, and it was sought to strike the family settlement from the court's files and to set aside the order of July 6, 1948. The court was asked to consider anew the matter of terminating the possession and control of the executor over the real estate and determining the devisees under the will. Further, the power of the probate court to cancel leases was attacked.

The minutes of August 1, 1951, the first day of the hearing on the motions and return, contain this statement, which apparently was made by the court: "Agreement raises question of whether certain heirs are estopped to deny, and until agreement question disposed of other question cannot be taken up. Court will take the questions in their proper order."

According to the minutes of August 2, 1951: "The Court ruled that sufficient notice was given of final accounts pursuant to the statute, and was notice to all who might be interested in the estate. Matter has been duly called and continued; however, order approving final accounts provided for filing of receipts by executor before discharge and that provision has not been complied with, therefore order of discharge has not become final. Executor to file accounting in 30 days from date of last accounting to this date."

At the conclusion of the hearing of August 2, 1951, the minutes further show the notation: "All motions will stand over until December 17, 1951, at 9:00 A.M., at which time hearing will be had on all matters except final accounts."

On August 8, 1951 the ten filed an answer to Kam Hon Ho's return of August 1, 1951, in which they reiterated their position that the probate court had power to cancel leases. They claimed that they were devisees under the will, asserted that the notice of the hearing

on the petition for approval of final accounts[6] was duly published as provided by section 12030, R.L.H. 1945, now R.L.H. 1955, § 317-31, asserted further that "this court has the jurisdiction to remove said Executor and the provisions of section 12014, R.L.H. 1945 [now R.L.H. 1955, § 317-14] are not applicable," denied the allegations concerning the invalidity of the family settlement, and asserted estoppel of the seven to set aside the family settlement and laches. They further asserted "that this Court is without jurisdiction to hear the said Petition to Strike 'Family Settlement' in that said petition should be heard by a Court sitting as a Court of Equity in that the alleged grounds for striking said Family Settlement are equitable grounds * * *."

Three supplementary accounts were filed on September 10, 1951. They showed partial distributions to each of the seventeen. They also showed that the executor had continued to collect the rents of the real estate after the order of July 6, 1948.[7]

Finally, on December 14, 1951, the six who are appellants here, *i.e.*, all of the seven except Kam Hee Ho, executor, filed a motion in the probate court to set aside the order of July 6, 1948 and to strike the family settlement of May 17, 1948. They asserted that the family settlement was entered into under mistake, without consideration, and as a result of misrepresentation, and further asserted lack of authority to file the family settlement, that movants were not represented at the hearing

---

[6]Actually the published notice was sufficient to cover, as well, the matter of the determination of the persons entitled to the real estate, provided for by R.L.H. 1955, § 317-14. That is a matter distinct from the approval of final accounts, provided for by R.L.H. 1955, § 317-31, though section 317-31 provides that: "The notice required to be given in accordance with the provisions of section 317-14 may be combined with the notice required to be given under the provisions hereof."

[7]A fourth supplementary account shows that the executor continued to collect the rents until he was removed in 1952.

in the probate court at which the family settlement was filed, and that the order was based on the family settlement with no judicial determination of the merits. We interpret this motion as a joinder by the remaining five in what really was a counter-motion contained in the return of Kam Hon Ho of August 1, 1951, and we interpret the answer filed by the ten on August 8, 1951 as a return to the motion of the six.

No written order was entered by the probate court with respect to the foregoing. There was an oral decision made at a further hearing of December 18, 1951, and entered in the minutes as follows:

> "It is the ruling of the Court that the family settlement is in the nature of a compromise assignment of rights. It is also the ruling of the Court that the Probate Court, that agreement being attacked on the grounds of fraud, mistake and other equitable grounds, would bring the determination of its validity into a court of equity, and beyond the powers of the Probate Court.
>
> "The Court will, therefore, order any further determination of any other questions, including the accounting of the executor, to be held in abeyance until a determination is had by a court of equity of the validity of the family settlement.
>
> "At this time, however, there is pending before the Court other questions relating to the alleged wrongful making of leases by the executor and wrongful expenditures of estate funds. The Court will at this time require the executor to file good and sufficient bond in the sum of $15,000.00."

The executor did not file this bond as ordered and was removed on that ground and an administrator with the will annexed appointed on March 12, 1952. Meanwhile, on

February 27, 1952, the instant suit was commenced,[8] pray-
ing that the family settlement of May 17, 1948 be declared
null and void, that the order of July 6, 1948 be set aside
or declared null and void, that the seven be determined
to be the devisees under the will of Ho Poi, deceased, and
that restoration by the ten of the partial distributions
made by Kam Hee Ho as executor be ordered. By the
decision of the court below, rendered March 24, 1958, the
family settlement was found to be valid and pursuant
thereto the petition of the six was dismissed.[9] This appeal
was taken from that judgment.

*Jurisdiction of the probate court—personal property.*
We first will consider the jurisdiction of the probate court
with particular respect to the personal property. As to
the real estate there is a distinguishing feature as noted
in another portion of this opinion.

As held in the case of *In re Blyman's Estate,* 382 Ill.
520, 47 N.E.2d 710, a probate court[10] is not governed by
the rule[11] requiring that a proceeding to set aside a judg-
ment be initiated during the term in which the judgment
was rendered. However, once a decree of distribution has
become final and the property of the estate has vested
thereunder, the title so vested cannot be "modified or

---

[8]In 1956 Kam Hon Ho, Kam Man Ho and Kam Kong Ho, three of
the seven, filed motions in the probate court seeking to have the probate
court make a new decree determining the lawfully begotten children
without regard to the family settlement, or to have the probate court, if
necessary, itself determine the validity of the family settlement. Due
to questions as to representation of the various parties these motions
were not heard until 1958, after the decision and judgment in the in-
dependent suit, from which this appeal was taken. The probate court
ruled that it would take no action until this court disposed of the appeal.

[9]An earlier ruling of the court had passed upon a demurrer and
sustained the petition. The defense of laches, denied at that time, has
not been further urged in this court and has not been considered.

[10]The Hawaii Rules of Civil Procedure are not applicable to probate
proceedings except in instances not here involved. H.R.C.P., Rule 81(a).

[11]See *Holiona* v. *Kamai,* 24 Haw. 638, *Rhoades* v. *Maciel,* 25 Haw.
579, decided prior to the Hawaii Rules of Civil Procedure.

defeated by any after proceedings of the same tribunal
* * *." *In re Everett's Estate,* 113 Vt. 265, 268, 33 A.2d
223, 225. An independent suit then is the only possibility.
Ordinarily such a suit is premature when it still remains
within the power of the court that rendered the judgment
to set it aside. See Am. Jur., *Judgments,* § 813.

The order of July 6, 1948, having been based entirely
on the family settlement, was a judgment by consent. *In
re Everett's Estate, supra* at 226. While still under the
control of the probate court, it was subject to that court's
power to set it aside for sufficient cause, as in the case of
any other judgment. Am. Jur., *Judgments,* § 638; Annot.,
139 A.L.R. 421. Accordingly, the probate court had power
to consider the circumstances of the family settlement
insofar as material to the attack on the judgment, as was
done in the case of *In re Nielsen's Estate,* 198 Wash. 124,
87 P.2d 298.

The proper course would have been for the probate
court to determine whether it would "open the judgment."
See *Krummel* v. *Hintz,* 222 S.W.2d 574 (Mo. App.) ; *Miles*
v. *Layton,* 38 Del. 411, 193 Atl. 567. The probate court,
however, notwithstanding its conclusion that sufficient
notice was given to sustain the order of July 6, 1948,
failed to consider the effect of that order. This appears
from the oral decision of December 18, 1951, and the
minutes of August 1 and 2, 1951. The ten insisted upon
adjudication in equity of the validity of the family settle-
ment making no contention that there was a binding
judgment. The probate court sustained their contention
that the matter was one for an equity court. It was not
until a supplementary memorandum was filed in this court
that the ten contended that the order of July 6, 1948 had
the effect of a judgment. That memorandum contended
that the order of July 6, 1948 was final and conclusive
in the absence of extrinsic fraud, citing *United States* v.

*Throckmorton,* 98 U.S. 61; *Crouse* v. *McVickar,* 207 N.Y. 213, 100 N.E. 697 and other cases.

*Power of equity court to give relief against judgment of another court.* It undoubtedly is the general rule that equity will not give relief against a judgment of another court on account of intrinsic fraud.[12] *Aloy* v. *Cooke Trust Co.,* 37 Haw. 171; 30A Am. Jur., *Judgments,* §§ 783-85. We agree with the holding in *Crouse* that this rule applies to judgments by consent. *Carr* v. *Bank of America Nat'l Trust & Sav. Ass'n,* 11 Cal. 2d 366, 79 P.2d 1096; but see annotation of *Crouse,* 45 L.R.A. (n.s.) 1159. However, the application of the rule is somewhat difficult. See *Kupele* v. *Sumner,* 4 Haw. 270, 274; Annot., 88 A.L.R. 1201; 30A Am. Jur., *Judgments,* § 791 *et seq.*

*Jurisdiction of the probate court—real estate.* At this point it is necessary to consider the order of July 6, 1948 with respect to the real estate. It provided "that the possession and control of said executor of all of the real estate and other property of said decedent and of his estate be and the same is hereby terminated; that said executor be and he is hereby authorized and directed to distribute all of the money, real estate and other property belonging to the estate of Ho Poi, the above named decedent to his following named children and heirs at law share and share alike," naming all seventeen.

While the order purported to terminate the executor's possession and control of the real estate it did so in the same terms as with respect to the personal property, and was open to the construction that the executor was to continue in possession until further action was taken by him to carry out the order. That in fact has been the con-

---

[12]Distinguishable is the principle permitting reexamination of an unexecuted equity decree when the aid of a court of chancery is sought to execute it. See *Atcherley* v. *Lewers & Cooke,* 18 Haw. 625, 19 Haw. 47, 334, *aff'd,* 222 U.S. 285, *superseded* by *Kapiolani Estate* v. *Atcherley,* 238 U.S. 119, *reversing* 21 Haw. 441.

struction put upon the order.[13] There being no third person who has been misled by the order we will follow this construction. It does not lie with the ten to urge a different construction, as shown by the proceedings reviewed in note 13.

The question that arises is the effect, under R.L.H. 1955, § 317-14,[14] of an order determining the devisees

---

[13] In the probate court the ten contended that said court had jurisdiction over the management of the real estate continuously up to the date of their 1951 motions attacking the executor's actions. They had Kam Hee Ho removed as executor for failure to make a $15,000 bond, ordered by the probate court on December 18, 1951 because of the pending motions of the ten. The ordering of this bond is indicative of the probate court's view that the executor remained accountable to the probate court for the management of the real estate during the years involved in those motions, which included years subsequent to 1948. In 1952 the probate court appointed an administrator with the will annexed with $15,000 bond, again indicating the probate court's view that the real estate remained under the control of that court, for as will appear but little personal property remained on hand. Likewise in 1952 a master was appointed to examine and report on the supplementary accounts of the executor, which accounts included the management of the real estate during periods subsequent to 1948, as appears from the master's report. The probate court reviewed the master's report by a 1954 order allowing the master's fee. We have no doubt that the probate court has continued to exercise control over the management of the real estate notwithstanding the order of July 6, 1948, and that the ten have advocated that the probate court do so, even contending that the provisions of section 317-14 were not applicable in determining the probate court's power to remove the executor.

[14] As amended, this section reads in pertinent part:

"§ 317-14. *Possession and control of real estate pending administration; distribution; determination of heirs.* The executor or administrator is entitled to the possession and control of the real estate of the decedent and to receive the rents, issues and profits thereof until such possession and control is terminated by order of court. * * *

"The judge having jurisdiction of the estate may, upon the application of the executor or administrator or of any person claiming as heir or devisee, at any time, by order of court, terminate the possession and control of the executor or administrator as to the whole or any part of the real estate and, in that connection, shall determine the heirs or devisees entitled thereto, and their respective estates or interests. * * * Such order shall be conclusive as to the rights of heirs and devisees, subject only to be reversed, set aside, or modified on appeal. A certified copy of such order shall be recorded in the bureau of conveyances, and if the land affected has been registered in the land court, a like copy shall be filed in the office of the assistant registrar of such court."

entitled to the real estate when the executor's possession of the real estate has not been terminated.

In the absence of statutory provision therefor, as held in *Smith* v. *Hamakua Mill Co.,* 13 Haw. 245, 247 (1901), speaking of probate proceedings in 1871:

"The Probate Judge had no jurisdiction either to declare the heirs of [decedent] in a direct proceeding instituted for that purpose as distinguished from a proceeding for the distribution of the estate or a portion thereof (see as to this distinction *Mossman* v. *Hawaiian Government,* 10 Haw. 426, 432), or to make a distribution of the real estate."

Further, as there pointed out, when an administrator had in his hands personal estate of the decedent to be distributed, and there was a sufficient petition for its distribution and a sufficient notice of the hearing, and an adjudication of heirship as to the personal property was made:

"* * * assuming that * * * such adjudication is binding as to its subject matter, the personal property, the question remains whether such adjudication of heirship in probate with respect to the personal property is binding * * * with respect to the real property."

The court then concluded:

"Whether it would be binding if [the party allegedly an heir but not so adjudicated] * * * appeared as a party in the probate proceedings is a question upon which there might be some difference of opinion (see *Mossman* v. *Hawaiian Government, supra,* 432), but that it would not be binding unless she did appear as a party in those proceedings is settled by the decision in that case * * *." (p. 248)

As to the authority of a probate court under paragraph fourth of section 37, chapter 57, S.L. 1892, now R.L.H. 1955, § 215-18(c), "to determine the heirs at law of

deceased persons and to decree the distribution of intestate estates," as was held in *Estate of Kaiena,* 24 Haw. 148, 150 (1917), this "extends only to cases where the decedent left no valid will," and confers no authority to decree the ownership of land where decedent left a will. Under the practice prior to the enactment of R.L.H. 1955, § 317-14, the rule was that: "No decree of court is necessary or appropriate to vest the title to real estate in the devisee." *Estate of Kaiena, supra* at 151.

As originally enacted by Act 262, S.L. 1923,[15] R.L.H. 1955, § 317-14, did not provide for recording of the order made under that section. Also, the original statute did not contain specific language as to the conclusiveness of the order.[16] Such provisions were added by S.L. 1927, c. 151. Other significant amendments were made in 1935, as next reviewed.

The original statute provided that the executor or administrator is entitled to the possession and control of the real estate "until the estate is settled or until the real estate is delivered over to the heirs or devisees * * *." This is in contrast with the words "until such possession and control is terminated by order of court" in the present statute as amended by S.L. 1935, c. 122. Furthermore, under the original enactment the authority of the probate judge was to, at any time, "order the distribution or partial distribution of the real estate and for that

---

[15]A related provision was contained in the Land Court Registration Act, S.L. 1903, c. 56, s. 92. As amended, it now appears as the first paragraph of R.L.H. 1955, § 342-89. Also, by Act 169, S.L. 1923, there was enacted a provision which now appears as R.L.H. 1955, § 224-24, relating to prima facie evidence derived from a probate court's decree or order of distribution in case of intestacy. Neither of these sections is involved in this case.

[16]However, according to Stand. Com. Rep. No. 303, Sen. J. 1923 Regular Session, p. 710, it was intended that "the finding of the court as to matters of heirship and descent shall be binding for all purposes," and according to Stand. Com. Rep. No. 582, H.J. 1923 Regular Session, p. 1223, the purpose was "to have the order of distribution in the estates of decedents settle the titles to the real estate left by the decedent."

purpose [the judge] may determine the heirs or devisees entitled thereto." As amended in 1927, the word "may" read "shall." The original statute, as so amended, is in contrast with the present statute, which pursuant to the 1935 amendments authorizes the probate court at any time, to "terminate the possession and control of the executor or administrator as to the whole or any part of the real estate and, in that connection, shall determine the heirs or devisees entitled thereto, and their respective estates or interests." This 1935 act was an amended version reported by the Senate Committee on Judiciary, which in Stand. Com. Rep. No. 91, Sen. J. 1935 Regular Session, p. 468, stated:

"While your Committee realizes that title to real estate vests in the heirs or devisees upon the death of the decedent and that technically there can be no distribution by the executor or administrator of such real estate to such heirs or devisees, it nevertheless feels that the provision requiring the determination of heirs or devisees should be retained in the statute and that the language of the statute itself should be clarified and that the bill should be amended accordingly."

And in Stand. Com. Rep. No. 490, H.J., Regular Session of 1935, p. 1454, the House Committee on Judiciary stated:

"* * * Under the present law the administrator or executor has possession and control of said real estate until the estate is settled or distributed to the heirs or devisees. Under the Bill the judge, upon proper application, may terminate the possession and control of the executor or administrator as to the whole or any portion of the real estate and in said connection shall determine the heirs or devisees of said property."

What has developed, as appears from the foregoing,

is legislative provision for a probate court to determine the devisees of property passing under a will by an order which, then and there, subject only to the right of appeal, terminates the possession of the executor and becomes the muniment of title of the devisees. The taking effect of such an order, if made in conformity with section 317-14, is not deferred until action by the executor to carry it out, though of course the executor remains accountable for the period during which he was in possession and control. Conversely, if the order does not then and there terminate the possession of the executor it does not ripen into a judgment until the possession of the executor is terminated.

The power to determine the devisees is entirely statutory. The statute holds open the matter of the determination of the devisees for the full period during which the executor remains in possession of the real estate under the control of the probate court, the statute reading: "The judge * * * may * * * terminate the possession and control of the executor or administrator as to the whole or any part of the real estate and, *in that connection,* shall determine the heirs or devisees entitled thereto * * *." (Italics added.) This is different from the probate court's power over personal property, as to which the court orders the distribution to be made by the executor thereafter. That procedure, originally incorporated in the statute as to the real estate, was changed in 1935.

*Status of the order of July 6, 1948—real estate.* The six were not present at the hearing on the family settlement or at the time the order of July 6, 1948 was entered. The order was dependent for its effectiveness upon strict compliance with the provisions of the statute. As stated in *Goldberg* v. *Trustees of Elmwood Cemetery,* 281 Mich. 647, 649, 275 N.W. 663, 664: "'* * * a consent decree, in order to be valid, must come within the jurisdiction of the court * * *." Annot., 86 A.L.R. 84, 88.

While the executor still was in possession of the real estate, the six made their appearance in the probate court and launched their attack upon the order. Although the case would have stood differently had the order been construed and acted upon as terminating possession on July 6, 1948, under the particular and unusual circumstances of this case the probate proceedings heretofore had are not determinative.[17] Hence the question is whether the family settlement itself estops the six. If not, they are entitled to a hearing on and determination by the probate court of the devisees entitled under the will.

*Status of the order of July 6, 1948—personal property and income.* With respect to the distribution of the personal property of the estate and the net balance of income shown by the accounts as approved, the case stands differently and the order of July 6, 1948 does have the status of a judgment.

According to the master's report filed after the rendering on April 3, 1952 of the fourth and last supplementary account of Kam Hee Ho, this income and personalty have been distributed among the seventeen, except for some odd lots of shares. These odd lots were the only personal property covered by the order of July 6, 1948 which remained within the control of the probate court when the 1951 oral decision was made by that court.

Despite the breadth of the terms used in the order of July 6, 1948, it did not dispose of income of the real estate not yet accounted for. That would have required a determination of the devisees entitled to the real estate, and as we have said such determination was not finalized

---

[17]The probate court, at the insistence of the ten, ruled that the attack on the family settlement was within the jurisdiction of equity. This had the effect of setting aside the oral order permitting the filing of the family settlement in the probate court. See note 19 *infra.* The order of July 6, 1948 not having been finalized as to the real estate, that leaves the real estate in the same situation as if the family settlement never had been presented to the probate court.

at that time because there was no effective termination of the executor's possession of the real estate. True, under the first paragraph of section 317-14 provision is made for "the net balance [of the rents, issues and profits of the real estate] to be paid by him [the executor or administrator] to the respective heirs or devisees entitled to such real estate, on the final distribution of the estate or on the prior order of the judge."[18] While the making of an order for distribution of income from real estate necessarily requires determination for that purpose of the persons entitled to the real estate, the latter ruling is merely a ground of the former, is not directly involved, and does not preclude a different ruling as to the title to the real estate at a subsequent stage of the case when there are claimants who did not appear in the former proceeding. See *Mossman* v. *Hawaiian Government*, 10 Haw. 421, *Smith* v. *Hamakua Mill Co.*, *supra*. Such is the situation here.

*Issues involved.* The rule requiring a showing of extrinsic fraud applies to an attack in an independent suit and is sound and applicable here with respect to the income and personal property already distributed under the order of July 6, 1948 and no longer within the control of the probate court.

With respect to the odd lots of shares not yet distributed, it still remains within the power of the probate court to set aside the order with respect to this undistributed property. Sound reason for setting aside the

---

[18]The complete sentence, which follows the first sentence quoted in footnote 14, reads:

"* * * He may make all necessary or proper expenditures for the care and protection thereof, including taxes and repairs on the buildings and other improvements thereon while under his control, for which purpose he may use such rents, issues and profits so far as necessary and available, the net balance thereof to be paid by him to the respective heirs or devisees entitled to such real estate, on the final distribution of the estate or on the prior order of the judge. * * *"

judgment nevertheless would have to be shown. See Annot., 139 A.L.R. 421. In the probate court, should the six be heard there on their motion to set aside the order of July 6, 1948, with respect to the undistributed stocks, the judgment in the present action is to be viewed only as a declaratory judgment, to be considered with other matters in determining whether the order of July 6, 1948 should be opened with respect to these stocks.

With respect to the real estate, and the income therefrom that had not been accounted for in 1948, the order of July 6, 1948 not having the effect of a judgment the issue is whether the six are estopped by the family settlement. That depends upon whether it was an enforceable agreement. See *Castleberry* v. *Bussey,* 166 S.W. 14 (Tex.). If there was no consideration for the family settlement[19] the six on that ground alone are not bound to abide by the family settlement[20] in any proceeding for the distribution of the income of the real estate for periods subsequent to the accounts approved by the order of July 6, 1948, or in any further proceeding under section 317-14 for the determination of the devisees of the real estate passing under Ho Poi's will, as to which no effective

---

[19] The family settlement of May 17, 1948 is to be distinguished from a stipulation, which at least in some instances (see *Barendregt* v. *Downing,* 175 Cal. App. 2d 733, 346 P.2d 870; *Howe* v. *Lawrence,* 22 N.J.L. 99, 104; 83 C.J.S., *Stipulations,* § 8) requires no consideration. Even if the filing of the family settlement gave it the character of a stipulation it was within the power of the probate court to relieve the parties therefrom. *State* v. *Foster,* 44 Haw. 403, 423, 354 P.2d 960, 971. By reference to an equity court of the issues concerning validity of the family settlement the probate court in effect has relieved the six of any legal significance which the mere filing of the family settlement might otherwise have had, leaving for determination the question whether the family settlement is an enforceable agreement with respect to the real estate.

[20] *Tipton* v. *McClary,* 227 Mo. App. 460, 54 S.W.2d 490, which holds that no consideration is required to bind an heir who has waived his rights in the estate in favor of another heir, is inapplicable. The dispute here is over the question whether the ten are devisees at all. *Tipton* might be applicable if the ten had waived their claims in favor of the six.

judgment has been entered. So also, if there was no consideration the six, on that ground alone, are not bound by the agreement in the proceeding brought in 1952 for the determination of the heirs of Chang Shee. Under the family settlement as finally executed the ten were to share in this estate also.

*The deed to Kam Hon Ho.* Before proceeding to consider the record and the law applicable to the issues above outlined, we will consider a distinguishing feature in the case of Kam Hon Ho. The record shows that contemporaneously with and as part of the very transaction which brought about the family settlement of May 17, 1948, Kam Hon Ho received a deed of the family home on Lusitana Street, owned by Chang Shee at the time of her death but to some extent involved in the Ho Poi estate also.[21] This was agreed upon at the meeting of the litigants held at the family home on a Sunday in March 1947, to discuss a settlement.

The deed to Kam Hon Ho was dated March 6, 1947. It is plain from the evidence, the dates involved, and the recitals in the deed itself, that the deed and the family settlement were parts of the same transaction.[22] The decision below so found and the finding is amply supported by the evidence.

*The making of the family settlement.* Resuming our review of the record, we begin with the Sunday in March 1947 (evidently March 2, 1947) when the family got together at the family home to talk over the dispute be-

[21]The family home on Lusitana Street was part of a larger piece owned by Chang Shee at the time of her death. According to an amended inventory filed by Kam Hee Ho as executor of Ho Poi's estate on September 25, 1945, Ho Poi owned a one-eighth interest in this property at the time of his death.

[22]Under the circumstances of this case the parol evidence rule does not preclude the connection of these two written instruments as parts of the same transaction. See 20 Am. Jur., *Evidence*, § 1093; *Fishel* v. *Turner*, 13 Haw. 392.

tween the seven and the ten. The ten were represented by an attorney and about seven of them were present. (Some of the ten appear to be nonresidents.) The executor's attorney was there, and six or possibly all of the seven. (One of the seven, Kam Yee Ting, is a nonresident and it is not clear whether she was present.)

Upon our review of the record we conclude that, except for the matter of the estate of Chang Shee which is taken up separately, the trial judge was within his prerogative in his findings as to what happened at this meeting. We find unconvincing the testimony of Kam Hon Ho, Kam Man Ho, Kam Kong Ho, and Young Tim Ho, four of the six, as to the insufficiency of their information as to the probate proceedings, the terms of the will, and the effect of the agreement which they signed. None of these parties was shown to have been in such circumstances that he was unable to think for himself, nor to have been in a position where he was particularly susceptible to the pressure put upon him by the attorney for the ten. So far as the Ho Poi estate is concerned, the proof is far from meeting the stringent requirements for rescission of a written agreement on grounds of mistake, misrepresentation or fraud. See *Soares* v. *Freitas,* 38 Haw. 64, *reh'g den.,* 38 Haw. 113; *Scott* v. *H. Hackfeld & Co.,* 17 Haw. 66. This is a case in which there applies the general proposition that a compromise is not necessarily defective because the parties did not know the full extent of their rights. 11 Am. Jur., *Compromise and Settlement,* § 25. Though these parties may not have known the exact language of the will, we are satisfied that they knew there was a dispute as to whether seven or seventeen were entitled to share in Ho Poi's estate and the nature of it.

As testified by Young Tim Ho:

"A. Well, when we came in there, I tried to get a settlement, see, agreement among the children. Judge

Heen [attorney for the executor] said the best way to do it is to have the will probated under the seven children. And then he said after it go through the Court and everything settled, then if the seven want to give it to the others, that is perfectly all right. But Fong objected to that. He wanted to include all the children as children of Ho Chang Shee.

"Q. (By Mr. Char) You mean Ho Chang Shee or Ho Poi?

"A. Ho Poi and Ho Chang Shee. He wanted to include all the children under one father and mother. But Heen did not think that would go about. He said he think they will have trouble. But Mr. Fong said, 'Nobody testify against. Things all right.'

* * * * * * * * * * * * * * * *

"Q. Do you have any idea what was the gist of that document?

"A. Well, all I could recall is that all seventeen children were entitled to a share and if we signed the *will*, [*sic*] that would finish up the estate."

Kam Yee Ting, who is a nonresident, did not testify and her case is no better than that of the four above named.

As to Kam Chin Chun Ming the case is more difficult. This petitioner, the eldest daughter, born in 1892, and aged 65 at the time of the trial, according to her testimony had had only two or three years' schooling. She testified through an interpreter. The court instructed the interpreter to admonish the witness to "just answer the question if possible 'yes' or 'no.' If she wants to explain her answer, she will have the opportunity to do so, but not to say anything further than what the answer calls for." Thereafter the court frequently interjected when a question was asked: "Answer yes or no." It is apparent from the record that the witness was hampered in her testi-

mony by this and other restrictions put upon her. Due to the age and poor education of the witness more latitude should have been given her.

Involved here is the specification of error asserting injudicious conduct on the part of the trial judge. In *Peterson* v. *McKinley,* 45 Haw. 44, 361 P.2d 60, we had occasion to note that such conduct ultimately is a matter for appellate cognizance. In the present case considerable hostility toward petitioners' witnesses and counsel was exhibited by the trial judge. Their counsel, however, was not without fault, repeatedly endeavoring to introduce evidence of the illegitimacy of the ten without recognizing the true nature of the issue, as developed at a later point in this opinion. It is argued by counsel for the ten, moreover, that counsel for the six did not, in the trial court, call the court's attention to the alleged injudicious conduct and this argument is well taken for the most part.

Due to the protracted litigation which already has been had and is still to be had, we have endeavored to resolve the issues so far as possible without requiring a new trial. We have given careful consideration to the testimony of Kam Chin Chun Ming to ascertain whether she understood what she was doing when she agreed to the family settlement.[23] In the review of her testimony

---

[23]Kam Chin Chun Ming testified:

"Q. (By Mr. Chun) Will you tell us why you signed the agreement?

"A. Because Mr. Fong shouted at us and asked us to sign, and I was scared. Even my sister, my brother's wife, said, 'If you do sign, I will die in this room to show you.'

"MR. CHAR: She said something else besides being scared. The first part of her answer, she said something else. Will you ask her to repeat that, your Honor?

"THE COURT: Yes.

"A. Kam Hon Ho asked me to sign it. Kam Kong Ho.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

"Q. Did you know anything about the contents of the family settlement?

"A. I don't understand. They wanted us to sign and wanted an equal share.

it must be borne in mind that she was present at the family meeting and heard the discussion. Her testimony shows that she relied upon the advice of others of the seven who were in the same situation as herself. She has no cause to complain even if it be true that on account of her age and lack of education she might have been entitled to a better explanation had she been handling the matter for herself without such advice. *Cf., Jones* v. *Jones,* 150 Tenn. 554, 266 S.W. 110. We are satisfied that her case stands the same as the cases of the other five.

*Chang Shee's estate.* The foregoing concerns Ho Poi's estate. As to Chang Shee's estate, it was shown that there was a first draft of the family settlement which did not include the settlement of this estate. The attorney for the ten caused the agreement to be redrafted to divide Chang Shee's estate among the seventeen, as well as Ho

---

"Q. Who wanted you to sign and who want equal share?

"A. Equal share for the ten children.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. You knew then, at the time of your father's death or immediately thereafter, did you not, that your father had left the property to seven of you children?

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"A. Yes, I know because they told me about it.

"Q. (By Mr. Fong) How soon after your father died did you know that?

"A. Well, it was a pretty long time because they had to file probate in court. They talk about it so I knew.

"Q. Did the family talk about it?

"A. Well, we talk among our sisters and brothers.

"Q. How soon after your father's death that your brothers and sisters and you talked about this?

"A. It is a pretty long time. After the case came up.

"Q. Now, when the ten children filed a document in court and stated that they were entitled to the estate of your father, did you know about that?

"A. I didn't see anything. I merely heard what they told me.

"Q. Yes. So you knew prior to the time that you had this meeting, which was about five or six years after your father's death, that there was a dispute over the estate of your father?

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"A. I heard something about it but I didn't know exactly what is all about and until I arrive at the meeting, \* \* \*"

Poi's. The new draft was signed by all the parties and filed on May 17, 1948 as above noted. There was testimony of petitioners that they did not notice that this new draft included Chang Shee's estate and the question is whether they have made out a case for relief.

The court found that "after it was agreed to let Kam Hon Ho have the family house, all the children at the meeting agreed to divide their parents' estate equally" but so far as the Chang Shee estate is concerned this finding is not sustained by the evidence. As to the Chang Shee estate, the only pertinent evidence concerning the agreement at the meeting is the following.

Kam Hee Ho, the executor, was asked if there was any discussion at the meeting concerning the house in which Kam Hon Ho was living (the family home), and testified:

"There was no discussion. I just suggested that half of this property belonged to Ho Chang Shee, my mother, and it should go to my brother, that is all."

The attorney for the ten, called by the six, testified:

"Q. You mean only that there was a dispute between these two sets of children?

"A. Right's right.

"Q. Regarding the Ho Chang Shee estate?

"A. That's right.

"Q. And the Ho Poi estate?

"A. Yes.

"Q. Was the Ho Chang Shee estate mentioned in that entire meeting, at the time of the meeting?

"A. Yes, it was. That's why it was incorporated in the agreement.

"Q. What was said about the Ho Chang Shee estate?

"A. I can't recollect.

"Q. You mean you have no recollection at all, whatsoever?

"A. No recollection."

This attorney previously had testified he could not recall "when was the first time that [he] knew about this Ho Chang Shee estate," or whether it was before or after the family settlement agreement. Further portions of his testimony are set out in a note.[24]

---

[24]"Q. They [previous witnesses] said that you make the statement that this meeting was called, that all the children are the lawful heirs of Ho Poi and everyone should have an equal share.

"A. I remember making a statement at the meeting that these ten have documentary evidence to show that they are the children of Ho Poi and Ho Chang Shee * * *.

* * * * * * * * * * * * * * * * * * * *

"Q. (By Mr. Char) Now, you said you make that statement in the meeting. Did you make any other statement?

"A. I made the statement that there was a contest of this suit, that the executor had filed in behalf of—had filed a petition in probate, stating that the seven which he listed down were the children of Ho Poi and Ho Chang Shee, and that we had filed a petition, the ten other respondents had filed a petition, stating that they were children of Ho Poi and Ho Chang Shee and that we claimed a one-seventeenth interest in the estate.

"Q. Any other statement that you make, Mr. Fong?

"A. And I believe, so far as my recollection is concerned, that if this matter could not be settled by the agreement of the parties that it had to be resolved in court.

"Q. Anything else?

"A. Then there was a lot of discussion.

"Q. No. I mean any statement that you made. We want to confine it to that.

"A. I made the statement also that when the proposal came up that the older boy get the home on Lusitania [sic] Street as part of the family settlement agreement, I said I thought it was fair.

* * * * * * * * * * * * * * * * * * * *

"Q. When was the first time you knew about the home was in Ho Chang Shee's name?

"A. I did not know that.

* * * * * * * * * * * * * * * * * * * *

"Q. (By Mr. Char) That is, you don't remember, as I understand your answer, that you don't know, the first time that you knew that this property at the corner, and the home, was property, one piece of property belonging to Ho Chang Shee?

"A. I didn't know that.

"Q. You didn't know of this at the time this family settlement agreement was signed?

Dr. Kwan Heen Ho, one of the ten, testified that: "The purpose of the meeting [the family meeting held at the home on Lusitana Street] was to see that the estates of my father and mother would be divided into seventeen equal shares." Previously Kam Hee Ho had testified that at the meeting he asked Judge Heen about Chang Shee's estate, that Judge Heen didn't say anything, that Dr. Ho was sitting nearby and said something about "my mother's," and that neither of the attorneys said anything about the Chang Shee estate. Cross-examined on this conversation, Dr. Ho could not remember it.

---

"A. At the time the family settlement agreement was signed, I assumed that Ho Poi had an interest in it.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. (By Mr. Char) At this meeting was there any dispute or discussion, that is, Ho Poi estate, dispute as to what property they own in their respective estates, Ho Poi and Ho Chang Shee?

"A. There was no segregation as to what Ho Poi owned or Ho Chang Shee owned.

"Q. I am asking you: Was there any dispute?

"A. The discussion was over the property of the two people, the two decedents.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. (By Mr. Char) Was there any discussion that Ho Chang Shee estate owned the property at the corner of Emma and Lusitania? [sic]

"A. As far as I recall, I don't, I believe—As far as I recollect, there was no discussion as to who owned what. The discussion was that these petitioners of mine, these clients of mine, claimed a one-seventeenth interest in the Estate of Ho Poi and Ho Chang Shee.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. (By Mr. Char) You mean you didn't know at that time, when you signed, when you make this notation on Exhibit 7, that Ho Chang Shee owned the store premises and the home now owned by Kam Hon Ho?

"A. I didn't know who owned what.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"THE COURT: What you are trying to ask him: Did anybody at that meeting claim that Ho Chang Shee estate owned that property [located on the corner of Lusitana and Emma Streets and the home]. Why don't you ask him that?

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"A. There was no discussion as to whether Ho Chang Shee owned the premises.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Q. And you don't know which estate that property came from, is that right? From Ho Poi or Ho Chang Shee.

"A. We knew it came from both estates."

The family settlement was drafted by one of the attorneys for the executor, not the attorney who attended the meeting, however. The more convincing evidence is that a carbon copy of the first draft was taken to the meeting by Kam Hee Ho, the executor, on instructions of his attorney, and was passed around at the meeting and signed by some if not all of the children present, there being thirteen signatures thereon when it was introduced in evidence. On this specific point the court made no finding.

The first draft, as originally typed, did not include the Chang Shee estate as already noted. Provisions for the inclusion thereof in the settlement were interlined on this draft in the handwriting of the attorney for the ten. Neither attorney had any recollection as to whether the interlineations were made before or after the signatures. However, the attorney for the ten, after examining the signed carbon copy bearing the interlineations, testified that "probably they [the signatures] were on" before he made the changes. He testified "probably this was drawn up and was signed and then after it came to me, I corrected it and sent it back."

Contrary to the testimony of the attorney for the executor it was the recollection of this attorney that there was no paper at the meeting. His conclusion that the copy was circulated before the interlineations were added is borne out, however, by his further testimony that it was he who corrected the typed names under the signature lines. It is obvious that these corrections were made to conform to signatures where persons had signed in the wrong places. We are convinced that the draft as originally typed was circulated and signed at the meeting.

In summary, the trial court's finding that there was an agreement at the meeting to divide Chang Shee's estate as well as Ho Poi's is supported only by bare conclusions

of two witnesses, the attorney for the ten and Dr. Kwan Heen Ho. The testimony of the attorney for the ten reflects an assumption on his part that the two estates would be handled the same. He failed to make that point at the meeting, however. The trial court itself found that the attorney for the ten explained at the meeting "that there was a contest *as to which children of Ho Poi would take under his Will.*" (Italics added.) After it was agreed that Kam Hon Ho take the family home there was no discussion at the meeting of the problem arising from the fact that the adjoining premises, as well, were in the name of Ho Chang Shee.[25] Chang Shee had left no will and at the time of the meeting her estate had not been brought into court and was not then in contest. With respect to inclusion of Chang Shee's estate in the agreement made at the meeting for division into seventeen shares, the trial court's findings are "clearly erroneous." (H.R.C.P., Rule 52(a)).

The second draft, which finally was executed and included the Chang Shee estate though the first draft had not, was circulated by the executor or one of his attorneys, there being some confusion as to just how this was handled. Kam Hee Ho denied that he obtained the signatures and testified that the second draft was assumed by him to be the original copy of the other draft, a carbon copy of which was circulated at the meeting. In the probate court, however, at the hearing preceding the filing of the family settlement, he had testified that he obtained the signatures.

Kam Hee Ho's attorney undoubtedly knew of and agreed to the inclusion of the Chang Shee estate in the settlement, but he was not the attorney for the six and could not make a decision for them. We think that a mistake occurred due to reliance by the six on what had

---

[25]See note 24.

been explained at the meeting and on the draft earlier circulated, coupled with the failure to hold another meeting to explain, or to inform the six by other means, concerning the inclusion of Chang Shee's property in the settlement. The testimony of petitioners that they did not notice this addition stands unrebutted.[26] Reliance by the six on what was explained at the meeting was justifiable under the circumstances. They were taken by surprise and signed an agreement which, with respect to the inclusion of the Chang Shee estate therein, was not the agreement that they had made. So far as the Chang Shee estate is concerned there was no meeting of the minds.

Though no agreement actually had been reached for the settlement of the Chang Shee estate, the attorney for the ten evidently supposed otherwise. He should have known, however, that the addition of the Chang Shee estate had not been agreed upon. We find that the fault lies with the ten.[27] They having induced the mistake may not urge unilateral mistake on the part of the petitioners. See *McNair* v. *Pub. Sav. Ins. Co. of America,* 88 Ind. App. 386, 163 N.E. 290; *Kilmer* v. *Smith,* 77 N.Y. 226; *Botsford* v. *McLean,* 45 Barb. (N.Y.) 478; *Cooper Grocery Co.* v. *Strange,* 18 S.W.2d 609 (Tex.); *Scott* v. *Spurr,* 169 Ky.

---

[26] We note that the deed to the family home, executed around the same time, recited that all seventeen were the owners of the property described in the deed and desired to convey it to Kam Hon Ho. As we have said, this deed was part of the settlement agreed upon at the meeting. The recitals in the deed were not sufficient to put petitioners on guard since the deed did not mention the adjoining store premises, and that property was not discussed at the meeting.

[27] We note that it was not the attorney for the ten who drafted the instrument. Nevertheless, it was he who caused the change to be made by the attorney for the executor. From the standpoint of the petitioners, they had a right to rely on a fiduciary relationship between themselves and the executor. However, the settlement of the Chang Shee estate was extraneous to the executor's duties, for he was not fiduciary of that estate. In adding that matter to the instrument the attorney for the executor occupied the position of a scrivener and was as much the agent of the ten as of the six. *Cf., Hoffman* v. *Chapman,* 182 Md. 208, 34 A.2d 438, 444; but see *Weinhard* v. *Summerville,* 46 Wash. 127, 89 Pac. 490.

575, 184 S.W. 866; *Smith* v. *Jordan,* 13 Minn. 246; 45 Am. Jur., *Reformation of Instruments,* §§ 57, 62, 81;[28] *Langley* v. *Irons Land & Dev. Co.,* 94 Fla. 1010, 114 So. 769; Annot., 59 A.L.R. 809, 817; 9 Am. Jur., *Cancellation of Instruments,* §§ 33-34; 12 Am. Jur., *Contracts,* § 133; 3 Pomeroy, *Equity Jurisprudence,* § 870a (5th ed.). The petitioners are entitled to relief from the mistakes made with respect to the Chang Shee estate.[29]

The effect of the invalidity of the Chang Shee estate settlement on the Ho Poi estate settlement must be considered. Upon review of the record we have concluded that except in the case of Kam Hon Ho, this matter does not affect the Ho Poi estate settlement as borne out by the testimony of Young Tim Ho[30] and Kam Hee Ho[31] on cross-examination by the attorney for the ten. The case is

[28]Although the remedy sought in this case is rescission, not reformation, authorities dealing with the latter matter are closely in point with respect to the equitable principles involved. For a comparison of reformation and cancellation as remedies, see 3 Pomeroy, *Equity Jurisprudence,* § 870 (5th ed.). Perhaps, as suggested in *Scott* v. *H. Hackfeld & Co., supra,* 17 Haw. 66, 68, even stronger proof is required to effect a reformation.

[29]We have not overlooked the fact that Kam Chin Chun Ming, Kam Yee Ting and Young Tim Ho signed Exhibit 10, which was an instrument whereby a settlement again was attempted in 1953. Even if this be deemed a ratification by them of the inclusion of the Chang Shee estate in the settlement, the point that they received no consideration is determinative as below noted.

[30]"Q. In other words, you would not have signed this instrument whether you knew that your mother's estate was included in this document or not; is that correct?
"A. That is right.
"Q. In other words, you would not have signed the instrument, regardless of whose estate was included?
"A. What do you mean by that now?
"Q. You would not have signed the instrument for any reason at all, is that right?
"A. When you explained to us that Sunday, that all seventeen children were entitled to the estate under the will, then I would have signed it."

[31]While Kam Hee Ho is not a petitioner his testimony is pertinent to show the situation of the seven. He testified:
"Q. Actually, Mr. Ho, and I will give you time to think, you are under oath now, you knew what you were doing when you signed that property settlement agreement?

one for partial rescission on account of mistake in the inclusion of a matter not agreed, leaving for disposition on other grounds the portion of the instrument concerning the Ho Poi estate, on which agreement was reached.

Moreover, none of the petitioners except Kam Hon Ho received any consideration for relinquishment of his asserted right to take one-seventh, instead of one-seventeenth, of the Chang Shee estate. The situation here is the same as with respect to the Ho Poi estate. This appears at a later point in this opinion.

There is evidence that the distributions made to the seventeen by the executor, Kam Hee Ho, included income from the rentals of the Chang Shee estate, though for what period does not appear. After determination of the heirs of Chang Shee, dependent upon the outcome and other facts not in evidence, there may be a right to an accounting for distributions of income from the Chang Shee estate. It will be the duty of the court below to retain the case for further consideration of this matter.

*Exclusion of evidence as to who was the mother of the ten; the issue of bona fides.* We next will consider whether error was committed by the trial court in excluding, as it did, practically all evidence as to who was the mother of the ten. This evidence was relevant insofar as it bore upon the question whether the ten asserted their claims in good faith. The difficulty is that the six did not offer the evidence on that theory. It was their proposition that "they [the ten] are illegitimate children and they have no right in this court at all." The trial court correctly

---

"A. Yes, I know what I was doing but not—I mean I signed the copy to file in court; all the time I thought it was the same as the copy I signed at home.

"Q. I see. And if that property settlement agreement only dealt with your father's estate, you would have dealt, is that right?

"A. Well, not now.

"Q. At that time?

"A. Yes, at that time."

ruled this was not the issue. The six were not entitled to try the case as though there had been no compromise at all. *In re Dayton's Estate,* 246 Iowa 1209, 71 N.W.2d 429. As stated in *Mills* v. *Mendonca,* 19 Haw. 357, 358:

" * * * It was neither necessary nor proper to prove at the trial of this case whether the circumstances justified the original claim or not, the modern and better rule being that the compromise of even a groundless claim, so long as it is bona fide, is consideration."

See 16 Am. Jur., *Descent and Distribution,* § 147. Annot., 38 A.L.R. 734, 118 A.L.R. 1357.

Not only on the issue of consideration but also on the issue of duress and the other issues, the bona fides of the claim of the ten was a vital point in the case. 11 Am. Jur., *Compromise and Settlement,* §§ 6, 7, 18; *Bellows* v. *Sowles,* 55 Vt. 391; *Purinton* v. *Purinton,* 190 Ark. 523, 80 S.W.2d 651; *Montgomery* v. *Grenier,* 117 Minn. 416, 136 N.W. 9.

The ten rely on the principle that family settlements are favored by the law, citing *Bunel* v. *O'Day,* 125 Fed. 303 (C.C.W.D. Mo.); *Warner* v. *Warner,* 124 Conn. 625, 1 A.2d 911, and other cases. However, they concede that the bona fides of the dispute is an essential point. See *Preston* v. *Ham,* 156 Ga. 223, 234, 119 S.E. 658, 662.

The six cite *Conklin* v. *Conklin,* 165 Mich. 571, 131 N.W. 154; *Cole* v. *Cole,* 292 Ill. 154, 126 N.E. 752; *House* v. *Callicott,* 83 Miss. 506, 35 So. 761, 763; *Ray* v. *Brewer,* 257 Ala. 253, 58 So. 2d 785; and *Wright* v. *Saltmarsh,* 174 Okla. 226, 50 P.2d 694, 703, for the proposition that the ten, if not "lawfully begotten children" of Ho Poi, had no interest in the estate and could not enter into a valid family settlement. In the first of these cases the parties to the settlement, second cousins of decedent of whom some were named in the will while others were not, made an agreement the purpose of which was, as the court

said, to cut off the first cousins. Specific performance of the agreement was denied. It was a case in which the parties were not proceeding in good faith.

*Cole* v. *Cole* is consistent with *Mills* v. *Mendonca, supra,* and sheds no new light on the issues. In *House* v. *Callicott,* the father of decedent who procured a settlement in favor of his granddaughter, decedent's daughter, knowing that there were no grounds to break the will, was held to have given no consideration. As the court stated: "He had nothing to compromise except a power to try to foment trouble in the family * * *." Likewise, in *Ray* v. *Brewer,* the stepson, whose participation in the settlement was rescinded, had no claim bona fide or otherwise so far as appears.

*Wright* v. *Saltmarsh* was a case in which, after the death of decedent's father, the heirs of the father sought appointment of an administrator for decedent's estate but the court appointed his widow and subsequently distributed the entire estate to her. Thereafter the father's heirs brought this ejectment action seeking to establish that a one-half interest was inherited by the father and alleging fraud of the widow in procuring distribution of the entire estate to herself when, as alleged, she had a verbal agreement with the father that he should take a half. The father's heirs, however, did not sue on this agreement. It was held there was no extrinsic fraud such as would cause the decree of distribution to be vacated. As to the verbal agreement, the court stated that the widow was not bound by it, which we think is self-evident from the fact that under it the father had relinquished no part of his claim, a point considered later in our opinion.

None of these cases supports the proposition that the ten could not enter into a family settlement unless they actually had an interest in the estate as distinguished from a bona fide claim.

The six, if they had recognized and properly presented the issue involved, should have been allowed to offer evidence tending to show that the ten knew, or must have known, that they were illegitimate children if such be the fact. Had there been sufficient evidence in that regard the burden of proof then would have shifted to the ten to show that their claim nevertheless was made in good faith. The claim of the ten, as gleaned from the present record, which includes the Ho Poi probate record, broadly stated was based upon: (a) the evidence that all seventeen were raised together as one family, (b) the possession by the ten of certificates of Hawaiian birth issued under the law which now is R.L.H. 1955, c. 57, Part II, and which showed that they were children of Ho Poi and Chang Shee,[32] a point which according to the attorney for the ten he stressed at the meeting in March 1947, and (c) the theory presented by a memorandum filed in the probate court on November 16, 1956, that the matter for determination in the Ho Poi estate proceeding was "what the testator meant by the phrase 'lawfully begotten' children."[33]

While the six failed to recognize the nature of the issue and consequently failed to make a proper presentation to the trial court concerning the relevancy of the evidence which the trial court excluded, the ten are not free from blame. When the six sought to produce from the ten the Hawaiian birth certificates upon which they relied

[32]The present record does not show who it was that caused the certificates to be issued in this manner, if such be the fact.

[33]In this memorandum it was argued: "In the case at hand, the records will show that the only minor children alive at the date the testator executed the will were members of the so called ten. It must be noted further that at the time HO POI executed the will, he was a widower. In said will, he appointed the said KAM HEE as the guardian of the persons and property of those of his children who were minors. The only minors were, as has been stated before at that time, members of the ten. Obviously, the testator must have been thinking of all seventeen of his children and it is contended, therefore, that 'lawfully begotten children' as used by him meant all seventeen children."

the ten objected. This objection was sustained. Again, on cross-examination of Dr. Kwan Heen Ho, one of the ten, objection was made to the attorney for the six asking him if it was his handwriting which appeared on the death certificate of Wah Teong Ho. The objection was sustained. Previously, when called by the six, the witness had testified that Chang Shee was his mother, that Chun Shee was a maid in the house, that Wah Teong Ho was a deceased brother, and that he didn't recall whether he had ever seen Chun Shee pregnant. The six were not allowed to introduce the death certificate into evidence, though offering it for the purpose of showing that in the handwriting of the witness it named Chun Shee as the mother of the deceased Wah Teong Ho. Clearly, the proffered testimony had some bearing on the good faith of the claim of this witness.

The trial court found "that the claim of the 'ten' children to share of their father's estate was made in good faith and that the settlement was made to resolve a bonafide dispute." We have concluded that this finding cannot stand. As above exemplified, the six did offer evidence bearing upon the question of bona fides. Such evidence was not received or considered. The situation is quite similar to that in *Warner* v. *Warner, supra,* 124 Conn. 625, 1 A.2d 911. There must be a new trial on the issue of bona fides to the extent that such issue enters into the case as set out below.

*Duress.* It is undisputed that the attorney for the ten threatened court action if the Ho Poi estate was not settled, and the trial judge so found. There was testimony on behalf of the six that they feared the expense of litigation and did not have legal advice. The trial judge took it to be the law that it was not duress for the ten to threaten to do what they had a legal right to do, and we would be in agreement with this conclusion were it not

that the record is incomplete in respect of the bona fides of the claim of the ten. As the matter stands the question of duress cannot be disposed of at this time; it turns on the ultimate determination on the question of bona fides.

*Mistake, misrepresentation, fraud.* Concerning the issues of mistake, misrepresentation and fraud, except for the matter of the Chang Shee estate we find no ground for reversing the lower court. The duress issue covers everything of significance.

*Extrinsic fraud.* If there was duress, then there will be a further question as to whether this was tantamount to extrinsic fraud. Should it be established that the ten did not have a bona fide claim, consideration will have to be given to this matter. We deem it inadvisable to attempt to formulate the legal principles involved on the present record.

*Kam Hon Ho's right to notice.* Though Kam Hon Ho, by reason of his appearance by attorney, should have had notice of the proceedings in the probate court through his attorney in addition to the published notice, we are satisfied this is not a case in which a party has been deprived of his right to litigate by reason of lack of notice.

It appears from Kam Hon Ho's testimony that back in 1941 he knew what was in his father's will and expected trouble. He testified that he signed the family settlement because he got free and clear the home in which he was living, and was scared by the threats of litigation. He was well aware that he was settling out of court and he chose to proceed without his attorney. He had ample opportunity to consult his attorney.

The question whether the settlement should be confirmed in court or carried out later through the formation of a corporation in which all would share equally was discussed at the March 1947 meeting and it was agreed

that the first course should be followed. Subsequently, distributions were received that could only have been made by virtue of the confirmation in court of the plan agreed upon. Still Kam Hon Ho did not consult his attorney. No objection was made until the dispute over the lease arose in 1951.

While Kam Hon Ho's attorney apparently was ignored by inadvertence this was not excusable. The appearance of the attorney was on file. Nevertheless, the order of July 6, 1948, being in accordance with the agreement, will not be vacated merely because of lack of notice. *Cf., United States ex rel. Knupfer* v. *Watkins,* 159 F.2d 675 and *United States* v. *Borchers,* 163 F.2d 347, holding that the right of one who has entered an appearance to have notice of the application for judgment does not confer any right to have vacated a decree entered by his own consent. Kam Hon Ho's rights turn on other issues.

*Consideration.* As we have said, if there was no consideration the six on that ground alone are not bound to abide by the family settlement with respect to the real estate.

Once again the case of Kam Hon Ho must be separately considered. The other five, Kam Chin Chun Ming, Kam Yee Ting, Kam Man Ho, Kam Kong Ho and Young Tim Ho, each received under the settlement only the one-seventeenth share to which he or she had an undoubted right. There was no claim, bona fide or otherwise, made by the ten that ran counter to the right of these parties to at least one-seventeenth or 7/119. The area in dispute was the 10/119 constituting the difference between one-seventeenth and one-seventh. The ten relinquished not one iota of their asserted right to this 10/119. Applicable here is the statement in *Keauhulihia* v. *Puahiki, supra,* 4 Haw. 279, 283, that it is not apparent what a party compromises "when he only claims a half and is given all that and

relinquishes nothing * * *." In *Keauhulihia* it was held that the brother and sister who gave all that the husband of the intestate claimed received no consideration, and the same is true here as to the five above named who gave all that the ten claimed. As to the holding in *Keauhulihia* that relief should be given the brother and sister for a mistake of law, that aspect of the decision is inapplicable in this case.

The abandonment of threatened litigation is not a consideration unless some concession is made so that the result is different from and less satisfactory than that sought in good faith by the threatened litigation. *Cf.*, *Marsant* v. *Marsant*, 108 Kan. 12, 57 Pac. 958. Had a decree of distribution been entered in favor of the seven, the ten withdrawing their opposition thereto in reliance on the promise of the seven to share with them outside of court, that would have been a different situation. See *De Caro* v. *De Caro*, 13 N.J. 36, 97 A.2d 658, 42 A.L.R.2d 1312, annotated at 1319; *cf.*, *Estate of Spitz*, 24 Haw. 649. Here no concession was made to the five parties above named with respect to the shares to be taken, and there was no withdrawal of the contest of the ten. The so-called saving of litigation—the asserted consideration—if it had been achieved would have signified merely the successful attainment by the ten of all that was sought from these five without the need to litigate. It is our view that Kam Chin Chun Ming, Kam Yee Ting, Kam Man Ho, Kam Kong Ho, and Young Tim Ho received no consideration for the family settlement.

*Consideration—effect of the deed to Kam Hon Ho.* As we have seen, Kam Hon Ho received consideration in the form of a deed to the family home. That is, it was consideration if the ten had a bona fide claim with respect to this property.

Assuming for present purposes that the ten had a bona

fide claim (this issue being unresolved by reason of our having set aside the finding of the court below) there arises the further question whether the deed to the family home was consideration not only to Kam Hon Ho but also to the other five. Of course, consideration may move to a third person. 1 Williston, *Contracts,* § 113 (3d ed.), 12 Am. Jur., *Contracts,* § 76; 1 Am. Law. Institute, *Restatement of Contracts,* § 75(2); *Clark & Henery* v. *H. Hackfeld & Co.,* 16 Haw. 53, 63. Accommodation paper is a common instance. *Honolulu Sav. & Loan Co.* v. *Ing,* 40 Haw. 269. However, as in the case of any consideration, the benefit must be the inducement for the promise. "Consideration is a present exchange bargained for in return for a promise." 1 Williston, *id.,* § 111.

After careful review of the evidence we have concluded that the deed to the family home was consideration to Kam Hon Ho only. Kam Hon Ho's wife influenced him to refuse to settle for an equal division. As testified by the attorney for the ten:

"A. * * * There was a lot of discussion and Mrs. Kam Hon Ho brought up the subject that Kam Hon was the oldest boy and that he had spent quite a lot of time in the family's business. She brought up the question also as to certain amounts of money that Ho Poi had borrowed from him or used and that he was entitled to some remuneration. And finally the discussion boiled down to an agreement to give him the home on Lusitania [*sic*] Street."

Thus, while the meeting was called to consider the claims of the ten versus the claims of the seven, Kam Hon Ho felt he had a different position, and a three-way controversy developed. The others of the seven did not bargain for Kam Hon Ho to receive the family home. It was the solution to Kam Hon Ho's demands. True, it was suggested by Kam Hee Ho as he testified, and the others of

the seven were agreeable to it and conveyed their own shares. It nevertheless remains a case in which each party was contracting separately from the others and each was contracting only in his own behalf.

In the trial court all of the resident petitioners were subpoenaed by the ten, put on the stand, and over objection asked whether they wanted to abide by the settlement or rescind it. As appears from the colloquy between the court and counsel, the object was to separate the ranks of the six and bring about a situation where some would abide by the settlement even if others would not. This must have been on the theory that seven separate contracts were made, even though all signed a single instrument, and that is our view also. Upon the argument in this court no different theory was urged by the ten, it being their contention that the consideration lay in the avoidance of litigation expense, on which point we have held against them.

*Reconveyance of the family home by Kam Hon Ho—effect.* Kam Hon Ho, who received the family home, is in a different position from the other five. The rule is that a complainant who seeks to have a transaction cancelled must offer to return whatever he may have received from the defendants in the transaction. 19 Am. Jur., *Equity,* § 464. This is part of the maxim that: "He who seeks equity must do equity," which as explained in *Macfarlane* v. *Catton,* 16 Haw. 544, 548, requires that a plaintiff proceed in accordance with his own theory. So one who seeks to repudiate a settlement and throw the subject matter into the arena of litigation cannot at the same time claim the benefit of the agreement he is repudiating. He must tender a proper instrument for the restoration of the status quo. 11 Am. Jur., *Compromise and Settlement,* § 34. Annot., 134 A.L.R. 6, 164.

As amended May 14, 1957 the petition in the present

action contains the general allegation: "That petitioners have done, and have offered to do and shall well do whatever may by equity or good conscience be required of them to be done in the premises." At the trial counsel for the petitioners made the following offer of record:

"MR. CHUN: The petitioners offer to return whatever benefit they may have gained, if any, by virtue of the family settlement and return such benefit, if any, to the estate of Ho Poi and the estate of Ho Chang Shee for distribution according to law, and that a deed by Kam Hon Ho to the heirs of Ho Chang Shee, conveying the property described in the Respondents' Exhibit B will be filed."

However, we do not find anything in the record to show that such a deed actually has been tendered. Kam Hon Ho has no standing in this proceeding until and unless he makes the tender of this deed. It will be the duty of the trial court, upon the remand of the case, to enforce this requirement before permitting Kam Hon Ho to proceed further.[34] See *Hadley* v. *Hadley,* 79 Ore. 573, 155 Pac. 195.

There arises a question as to the status of the Ho Poi estate settlement in Kam Hon Ho's case. Inasmuch as the rescission by this petitioner of the settlement of the Chang Shee estate requires him to return what he has received, this in turn requires that the ten also restore the status quo and release Kam Hon Ho from the settlement of the Ho Poi estate. That is, the ten must do so unless, of course, they waive the return of the family home. They likewise, unless they waive the return of the family home, will be accountable to Kam Hon Ho for the difference between one-seventh and one-seventeenth in the

---

[34]We have not required any tender by Kam Hon Ho, or any of the petitioners, of the distributions of income and personalty so far received, as it is well settled by the authorities above cited that a party need not restore amounts to which he is indisputably entitled.

distributions of income and personalty if they fail to sustain their claim under the will of Ho Poi. By reason of the restoration of the status quo by Kam Hon Ho they will not be in a position to stand upon the family settlement or the order of July 6, 1948 so far as Kam Hon Ho is concerned, irrespective of how the case might have stood otherwise.[35] On the other hand, should the ten ultimately sustain their claim to a share in the family home, Kam Hon Ho will be accountable to the ten for his use and occupancy of the family home dependent, however, upon his rights as a tenant in common of that property under the doctrine of *De Mello* v. *De Mello,* 24 Haw. 675.

*The situation of Kam Hee Ho.* Kam Hee Ho is not a petitioner. He filed an answer in the court below praying that "the prayer of said Petition be denied and that said Petition be dismissed." If the fact be that he originally took a one-seventh share, or 17/119, he has assigned to the ten 10/119. He has not made any effective disavowal of this assignment.[36]

*Conclusions.* Upon the remand of this case the judgment appealed from shall be vacated, and an appropriate decree entered:

(1) Rescinding the family settlement of May 17, 1948 in toto in the case of Kam Hon Ho and relieving

---

[35]However, if the ten should waive the return of the family home, that would leave for disposition on other grounds all questions concerning Kam Hon Ho's right to set aside the family settlement and the order of July 6, 1948 with respect to the Ho Poi estate.

[36]We note that Kam Hee Ho, on November 14, 1957, was put on the stand by the attorney for the ten after interrogation of the petitioners concerning their desire to rescind the settlement as above set out. The following then ensued:

"Q. You have heard the questions I have asked your brothers?

"A. Yes Sir.

"Q. What is your answer to that?

"A. At the present time I think this estate should go to the seven."

Further testimony of Kam Hee Ho is quoted in note 31.

We deem such testimony an insufficient basis for the granting of any relief to Kam Hee Ho in the instant suit, there having been no amendment of Kam Hee Ho's answer.

him of any estoppel consequent on the order of July 6, 1948, upon tender by him of the deed offered in the court below, but in the event of failure of this petitioner to tender the deed the petition shall stand dismissed in his case, and there shall be no rescission of the family settlement or relief from the order of July 6, 1948 so far as he is concerned;[37]

(2) Declaring that Kam Chin Chun Ming, Kam Yee Ting, Kam Man Ho, Kam Kong Ho, and Young Tim Ho are not bound by the order of July 6, 1948 or the family settlement of May 17, 1948 with respect to (a) the title to the real estate devised by the will of Ho Poi, deceased, or (b) the distribution of the income from this real estate for periods subsequent to the accounts approved by the order of July 6, 1948;

(3) Declaring that Kam Chin Chun Ming, Kam Yee Ting, Kam Man Ho, Kam Kong Ho, and Young Tim Ho are not bound by the family settlement of May 17, 1948 with respect to the division of the estate of Chang Shee into seventeen shares.

(4) Finding and concluding that there has not been shown any mistake, misrepresentation or fraud invalidating the family settlement with respect to the Ho Poi estate, reserving however for further proceedings the question whether there was duress, and if so whether it was tantamount to extrinsic fraud.

This decree shall be denominated a partial decree, juris-

---

[37] In the event of failure to tender the deed, if the fact be that Kam Hon Ho originally took a one-seventh share, or 17/119, he will be in the position of having assigned to the ten 10/119, except of course with respect to the family home.

However, if the ten should waive the restoration of the status quo as to the family home this would eliminate paragraph (1), would call for the inclusion of Kam Hon Ho as one of the parties taking the benefit of paragraph (3), and would leave for later determination the question of Kam Hon Ho's right to inclusion in paragraph (2) dependent upon whether he did in fact receive consideration, which in turn is dependent upon the question whether the ten had a bona fide claim with respect to the family home.

diction to be reserved by the court below over the remaining matters hereinafter enumerated, pending certain determinations. That is to say, those remaining matters which concern the Ho Poi estate are to be held in abeyance until determination by the probate court of (a) the devisees under the will, which matter may be reached at any time pursuant to paragraph (2) above, (b) the question of good faith of the claim of the ten with respect to the Ho Poi estate, which matter has bearing on the question whether the order of July 6, 1948 should be set aside with respect to the odd lots of shares not yet distributed, and (c) disposition by the probate court of the property and income remaining under its control. Those matters which concern the Chang Shee estate are to be held in abeyance until determination of her heirs. Further proceedings then shall be had to the extent that there remain unresolved issues.

These remaining matters, to be held in abeyance by the court below, are:

(5) The right, if any, to an accounting for distributions of income of the Chang Shee estate;

(6) The question whether there was duress in the settlement of the Ho Poi estate, and if so whether it was tantamount to extrinsic fraud. (This has bearing on No. 7.)

(7) The right of Kam Chin Chun Ming, Kam Yee Ting, Kam Man Ho, Kam Kong Ho and Young Tim Ho, if any, to an accounting for distributions of income and personal property of the Ho Poi estate made under the order of July 6, 1948;

(8) The right, if any, to an accounting from Kam Hon Ho for his use and occupancy of the family home, and the right, if any, of Kam Hon Ho to an accounting for distributions of income and personal property

of the Ho Poi estate made under the order of July 6, 1948;[38]

(9) Such issues concerning the leases made by Kam Hee Ho as may have been properly presented by the pleadings and become material in the case, dependent upon the ultimate devolution of the real property and the further action of the probate court, it being noted that this matter has been included by the ten in their answer in the present proceeding as well as in their motion in the probate court. This court has not passed upon such matters except that we have held that at the time of the present action the executor's possession of the real estate had not been effectively terminated under the statute, R.L.H. 1955, § 317-14.

Reversed and remanded for the entry of a decree and other proceedings in accordance with this opinion.

*Leon L. M. Chun* (*Nicholas W. Y. Char* with him on the briefs) for petitioners-appellants.

*Earl S. Robinson* (*Fong, Miho, Choy & Robinson* on the briefs) for respondents-appellees.

---

[38]However, see note 35. If the ten should waive the restoration of the status quo as to the family home this would eliminate paragraph (8), would call for the inclusion of Kam Hon Ho as one of the parties named in paragraph (7), and would call, further, for a paragraph reserving for later determination the question set out in the second paragraph of note 37.